State v. Welch.

---

No. 25,109.

THE STATE OF KANSAS, *Appellee*, v. L. E. WELCH, *Appellant*.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Change of Venue—Grounds—Local Prejudice.* The proceedings considered in a prosecution for robbery in the first degree, and held, a motion for change of venue, on the ground of prejudice against defendant in the minds of the inhabitants of the county which would prevent a fair trial in the county, was properly denied.

2. JURY—*Examination of Jurors—Propounding Question of General Nature to Group.* A request by the court that counsel for defendant facilitate progress in examination of jurors to determine their qualifications, by propounding questions of a general nature to all the jurors, or to groups of them, or at least to more than one juror at a time, was reasonable and proper.

3. ROBBERY—*Trial—Proceedings Generally.* Various assignments of error relating to proceedings at the trial considered, and held to be without merit.

4. NEW TRIAL—*Newly Discovered Evidence.* Evidence presented as having been discovered after the appeal was taken, perused as a matter of favor to defendant, and found to confirm the verdict of guilty.

Appeal from Wyandotte district court, division No. 3; WILLIAM H. McCAMISH, judge. Opinion filed July 10, 1926. Affirmed.

Criminal Law, 16 C. J. pp. 215 n. 13, 1206 n. 95; 27 R. C. L. 815. Juries, 35 C. J. p. 399 n. 22. Robbery, 34 Cyc. p. 1812 n. 98.

*James L. Hogin* and *Roy R. Hubbard*, both of Kansas City, for the appellant.

*Charles B. Griffith*, attorney-general, *Roland Boynton*, assistant attorney-general, and *J. H. Brady*, of Kansas City, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of robbery in the first degree, and appeals.

Defendant, who was a bootlegger of Kansas City, Kan., became associated with one of the organized bands of outlaws which infested Kansas City, Kan., and Kansas City, Mo., in the spring and summer of 1922. On July 22, Joe T. Howard's cigar store was robbed of $2,072 by three men, who escaped from the scene of the crime in an automobile driven by a fourth man. The robbery was executed according to plans laid at defendant's home. Defendant had possession for some purpose of a Buick automobile, which was a stolen car. On the morning of July 22 he removed the license plate from the car, substituted for it another bearing the number 6500, and drove to a hotel in Kansas City, Mo., where he picked up one of the group. The other two were in a Ford sedan, and the two cars were driven to Thirteenth and Penn streets. There the two men in the Ford car left it, got into Welch's car, and Welch drove to the scene of the robbery. The persons in the car were defendant Welch, George Willis, Floyd Dudley, and Harry Downs. At Thirteenth and Penn streets, Willis was recognized by A. S. Green, who also noted the license number 6500 on the Buick car. The Ford sedan was left in front of Greenbaum Brothers' store, and J. W. Grady, who worked in the store, made a memorandum of the license number on the sedan. His attention was called to it by Green. On the way to Howard's store, defendant produced two .38-caliber pistols from under the seat, one of which was given to Willis and the other to Dudley. When they reached the vicinity of Howard's store, defendant stopped the car and remained in it, keeping the engine running, while the others went into the store and committed the robbery. While the robbery was in progress, a pistol and holster were taken from Willie Roher, who was in the store. Afterwards, when Willis' room was searched, the pistol was found in his possession. After completing the robbery, Willis, Dudley and Downs returned to the car, and as defendant drove it away some

shots were fired. A bullet struck one of the rear tires of the automobile, but the tire did not blow out until Welch's garage was reached. Another bullet penetrated the back of the car. The course of the fleeing car was down Adams street. When it turned west on Osage avenue, which begins at Adams street, J. Kennedy, an employee of Wilson & Company, observed the car, which was traveling at a speed of thirty-five miles per hour. On learning of the robbery, Kennedy reported his observation of the car to the chief of police, and he afterwards identified Willis and defendant as occupants of the car. Following a circuitous route, defendant drove to his own home. There the money was divided. Two hundred dollars (ten per cent) was taken out and given to Willis for John M. Hagan, of Kansas City, Mo., the reputed "brains" of the gang. Welch was allowed a sum for repair of his car, and received approximately $500. Fred Stroth and Earl James came to Welch's house in a Cadillac car, and Willis, Dudley and Downs returned to Kansas City, Mo., with them. Defendant owned a Hudson car, which he had left with F. S. Beltz, who conducted an automobile repair shop. Defendant came for his Hudson car in a Buick car, which he left with Beltz. There was a bullet hole in the back of the car, plugged with a bolt. The police subsequently took possession of the Buick car. Willis and Dudley confessed, and, as witnesses for the state, told the whole story of the robbery at the trial.

Because of the abbreviated character of the abstract, the foregoing account may not be strictly accurate in some minor details, but it fairly represents the evidence on which the conviction rests. The defense was an alibi. Defendant slept until nearly noon the day of the robbery. The afternoon was to be devoted to a fishing trip to Bean lake with two men who came to defendant's house about 1:30 p. m., stayed about two hours, and went away without going fishing. The record does not disclose what became of the bait for the fishing trip.

For a considerable period of time, banks, business houses, and individuals of the city were preyed upon by the Hagan and other bandits almost at will. Before their depredations were checked, they had killed four men and had committed twenty-one robberies, netting approximately $100,000. The community became thoroughly aroused, and after a raid in which two police officers were killed, the president of the chamber of commerce called a mass

meeting, which was attended by seven or eight hundred persons. The situation was fully discussed, and a resolution was adopted looking to organized effort to aid the city and county officers in their endeavor to run down the outlaws and bring them to justice. The Kansas City *Kansan*, the daily newspaper of the city, discussed the condition of affairs freely and vigorously in editorials, published interviews with citizens, and gave news accounts of occurrences. The arrest of the participants in the Howard robbery marked the beginning of the end of the reign of terror. The fact that Willis and Dudley confessed, that Welch's home had been searched and forged government labels for bonded whisky had been found there, and other activities of officials and persons acting with them in respect to Welch's implication in the Howard robbery, were published.

Defendant filed a motion for change of venue, supported by his own affidavit only. Attached to the motion were copies of the newspaper articles and interviews referred to, the call for the public meeting, and a report of its proceedings. The affidavit concluded as follows:

"That by reason of all the facts heretofore set out, the inhabitants of Kansas City and Wyandotte county, Kansas, have become and still are so prejudiced against your petitioner that a fair trial upon the charges filed against him cannot be had in said city and county, and that a change of venue should be granted to your petitioner to some other county than Wyandotte county."

The state filed no counter affidavits, and the motion was denied.

The statute which permits application to be made for change of venue on the ground the minds of the inhabitants of the county are so prejudiced against defendant that a fair trial cannot be had in the county, requires the petition to set forth the facts on which the application is based. (R. S. 62-1321.) It is not enough that the petition state prejudice exists and a fair trial cannot be had. Specific facts and circumstances showing prejudice must be stated, and not conclusions. (*State v. Knadler*, 40 Kan. 359, 19 Pac. 923.) The portion of defendant's affidavit which has been quoted was a statement of his inference from the matter contained in the affidavit, and sufficiency of the application depended on the facts. (*State v. Bassnett*, 80 Kan. 392, 395, 102 Pac. 461.) The prejudice which will authorize a change of venue is not general prejudice against classes of conduct or classes of persons. It is prejudice against the defend-

ant to be tried, and it is not enough that prejudice exists against him. The prejudice must pervade the minds of the inhabitants of the county to such an extent a fair trial cannot be had in the county. (R. S. 62-1318; *State v. Furbeck,* 29 Kan. 532; *State v. Parmenter,* 70 Kan. 513, 515, 79 Pac. 123.) Tested by these rules, the application for change of venue was insufficient.

That the community had become thoroughly aroused, and had resolved to strengthen and supplement the forces of law and order and pit them in a square-toed fashion against the forces of lawlessness, was fully disclosed. That, however, did not authorize a change of venue. If so, by attaching books, tracts, newspaper and magazine articles, sermons, speeches, addresses, crime surveys, reports of investigating committees, and other matter to his affidavit, defendant might have shown it would be difficult for him to receive a fair trial anywhere in the United States. Some indiscreet utterances respecting measures for bringing security to the city were disclosed in the newspaper interviews, but they did not represent public sentiment. The mass meeting was an admirable civic affair, very earnest and very determined, but wholly restrained in deliberation and action within the bounds of legality and propriety. Some of the newspaper articles distributed vituperation about equally between thugs, lawyers, and courts which "adjust crime so that it is within the law and make immune the criminal," but the fury of the articles was not catching. There was no demonstration of any kind against Welch or any of his accomplices, when they were arrested or afterwards. There is no contention defendant did not have a fair, orderly, uncoerced preliminary examination. His counsel did not profess personal embarrassment, much less peril, in undertaking his defense, and the district court of Wyandotte county was not able to conceive that it was the galled jade which was expected to wince. Newspaper articles which reported results of police and other activity, and undertook to detail defendant's connection with the Howard robbery, were of the ordinary kind, and would not disqualify a juror whose impressions respecting defendant's guilt were derived from that source. Previous to the Howard robbery, defendant had not been suspected of brigandage. After his arrest there were no vilifying or inflammatory denunciations of him, and no effort was made to focus on him the indignation of the long-suffering community, or to translate its execration of the crimes

which had been committed into personal antagonism to him. There could be no dispute that Howard had been robbed by three men, who were driven from the scene of the robbery by a fourth man. The only material issue in the case was whether defendant was a member of the gang, and the application for change of venue disclosed nothing which indicated that a jury could not be selected from the body of the county which would try that issue dispassionately.

There is no immediate appeal from an order denying a change of venue. The order is reviewable only on appeal from conviction, and propriety of the order must finally be judged in the light of the proceeding resulting in conviction. A ruling may not be reversed merely to gratify a sentiment or to uphold a principle. The defendant must have suffered prejudice to his substantial rights. In this state, the readiness with which a qualified trial jury is obtained is pertinent to that subject. (*State v. Parmenter,* 70 Kan. 513, 515, 79 Pac. 123.) Defendant makes no complaint of difficulty in selecting a satisfactory jury. He does not suggest that, in examining jurors respecting their qualifications to sit, he found them to be in an excited state of mind, or so imbued with horror at what had been going on, or with detestation of crimes of violence, that wild conduct on their part was to be apprehended. He does not complain that any juror challenged for cause was permitted to remain on the jury. He does not show that he was obliged to exhaust his peremptory challenges. So far as the record discloses, no suspicion of prejudice against defendant entered the jury box when the jury was sworn, and there is no contention that an indignant populace invaded the precincts of the trial and communicated the contagion of its own mob passion to the panel. The statute provides that a new trial may be granted when a verdict is the result of passion and prejudice on the part of the jury. Refusal of the court to grant a new trial on that ground is not urged as error in this appeal. The result is, defendant's prediction that he could not have a fair trial failed, and the order of the district court denying the motion to change the venue of the trial is approved on two grounds: The application did not state facts sufficient to warrant the change, and the fact that a fair trial could be had in the county was demonstrated by the event.

Defendant's counsel adopted the practice of examining each juror

at length on all the stock instructions to jurors in criminal cases and others which defendant conceived might be applicable to the case. The method of examination was a time-killing process, and the court requested counsel to facilitate progress of the trial by propounding questions of a general nature to all the jurors, or to groups of jurors, or at least to more than one juror at a time. Counsel made a fuss about it, and the court admonished him to proceed in accordance with the suggestion, at the same time directing the jury that they were not concerned with the matter. The court's suggestion was reasonable and proper, and the remarks to counsel were appropriate to the occasion.

There is nothing else in the case which deserves formal discussion. The information was sufficient, the motion for continuance was properly denied, and the opening statement to the jury for the prosecution was not too broad or otherwise improper. The subject of conspiracy was not involved in the case at any stage or in any form. Defendant's alibi witnesses were properly interrogated with respect to their relation to defendant's bootlegging business as affecting their credibility. Disclosure that defendant was a bootlegger before he put his character in issue could not be prejudicial, since his attorney, in opening his case to the jury, exploited the fact for the purpose of the defense. The state did not depend on circumstantial evidence to establish defendant's guilt; the circumstantial evidence introduced was corroborative only, and an instruction applicable to a case in which guilt must be established by circumstantial evidence, if at all, was not required. One principal may be convicted on the uncorroborated testimony of another principal, the testimony being sufficient to establish guilt. The credit to be given the accomplice is a matter for the jury. (*State v. McDonald*, 107 Kan. 568, 193 Pac. 179; *State v. McKimson*, 119 Kan. 658, 240 Pac. 567.) A sufficient monitory instruction relating to scrutiny of the testimony of accomplices was given (*State v. Vandeveer*, 119 Kan. 674, 240 Pac. 407), and the jury were otherwise well instructed on the law applicable to the case. Other assignments of error are trivial or ill-founded, defendant's guilt was fully proved, and the motion for a new trial was properly denied.

Willis was a narcotic addict. After Welch's motion for a new trial had been denied and his appeal had been perfected, Willis made an affidavit in which he repudiated the testimony he had given at

Welch's trial, and gave an account of how it was procured.    Mr. J. H. Brady was employed by the Clearing House Association of Kansas City to assist in bringing to an end the banditry which was rampant in the city during the period which included the Howard robbery.    Mr. Brady had relations with Willis and Dudley in connection with their confessions and their appearance as witnesses for the state at Welch's trial.    The county attorney practically committed prosecution of the robbery cases to his deputy and Mr. Brady.    At Willis' trial and at the trial of one James Majors, Mr. Brady's relations with Willis and Dudley were fully disclosed. Willis' affidavit and the proceedings just referred to have been abstracted and have been presented to the court, on the theory the court may avail itself of authentic evidence outside the record in order to prevent a miscarriage of justice.    As a matter of favor to defendant, the court has perused the matter thus brought before it, and its conclusion is Willis' affidavit was false and the probability he testified truthfully at Welch's trial is increased to approximate certainty.    The court further concludes that Mr. Brady's conduct was in full accord with correct ethical and professional standards, and that he rendered invaluable service to his employer and to the public.

The judgment of the district court is affirmed.