Nos. 31,226 and 31,411
(Consolidated)

The State of Kansas, *Appellee,* v. George F. Taylor, *Appellant.*

(26 P. 2d 598.)

Opinion filed November 11, 1933.

*George K. Melvin, R. E. Melvin,* both of Lawrence, and *Elmer E. Hall,* of Kansas City, Mo., for appellant in both cases.

*R. B. Stevens,* of Lawrence, for appellee in both cases.

The opinion of the court was delivered by

Dawson, J.: These appeals, which have been consolidated for review, pertain to separate convictions of defendant for felonious assaults committed on his wife and brother-in-law.

Case No. 31,226 presents the record of the trial in the district court of Douglas county for the assault on defendant's brother-in-law; and case No. 31,411 presents the record of the trial in the district court of Franklin county, upon a change of venue, for the assault on his wife.

It appears that the defendant, George F. Taylor, and Bessie Christenson Taylor were married in 1921. Four children were born to them. At the time of the incidents narrated below, these were Ellard Wesley, aged 11; Edgar, 7; George Earl, 5, and Herbert, 2. The family lived for a time in Missouri, then in Iowa, again in Missouri, and eventually in Lawrence, Kan. The domestic life of husband and wife was not a happy one. The wife testified that on various occasions defendant threatened to kill her. In January, 1932, he chased her out of the house with a gun. She called the police and he was locked up for two days. About May 1, 1932, the discordant couple finally separated. Mrs. Taylor took her children to the residence of her brother, Everett Christenson, in Lawrence, and they have made their home with him since that time. Taylor traveled about the country—to Wichita, to Kansas City and elsewhere.

On July 6, 1932, while en route from Wichita to Kansas City, Taylor called at the Christenson home about 9 o'clock at night. Mrs. Taylor and the children were eating supper. He spoke to his wife through the window, saying, "Bessie, can I come in and see the children?" She said, "Yes, come in." He came in and kissed the children. Mrs. Taylor began to search his pockets to discover if he was armed. He drew out $10 and gave it to her, saying, "Here, take this, if that's what you're wanting." He also said he had a watch in his automobile for Edgar and went out to get it. The mother and two oldest children went along. About that time the brother-in-law, Everett Christenson, came home and found the two youngest children at the supper table. He took the baby on his arm and George Earl by the hand and went outside and in the semi-darkness saw his sister talking to defendant. Taylor said, "Let me see little George Earl," and picked him up. Then he said, "I think I will take little George Earl with me," and set the child down in the seat of his automobile. The mother screamed and rushed to recover it. Christenson, who still held the baby in his arms, put one foot on the running board and said, "Listen, George, you can't do that; you shouldn't do that." Taylor backed out of the car with a

gun. Christenson beat a rapid retreat. When he had gotten about fifteen feet away Taylor shot him in the back. This caused Christenson to let the baby fall, but he continued to run. When he was about ten feet farther away another bullet from Taylor's gun struck him in the back and he fell. Taylor then turned his attention to his wife. He shot at but missed her; then he seized her and shot her in the left breast. She testified:

"I remember seeing him turn and shoot at me. It seemed to me that a furnace must have grazed me. I remember that he grabbed me. It felt like a furnace or red hot poker, wonderful sensation just like a red hot poker going through me. I remember distinctly that it was Everett Christenson that was shot first. He shot him twice. He didn't grab me until he shot once and missed me, and then pointed here (indicating), here (indicating), and here (indicating). He wanted to be sure he got the right place. Finally I had that wonderful sensation to go through me; just like fire. I didn't see any fight there between my brother and George Taylor. There wasn't any such fight. I distinctly remember that. I was in the hospital nearly eight months."

Taylor then fled, taking the child with him. He changed automobile license numbers in Ottawa. At Arkansas City next day he cashed a $1,000 bond and withdrew a deposit of $250 from a local bank there, and was arrested in Laredo, Tex., three days later.

Separate prosecutions for the shooting of the two persons were instituted against defendant in Douglas county. Separate motions for a change of venue were filed. The trial court took these under advisement, and eventually overruled the application in case No. 31,226, and granted it in case No. 31,411. The jury returned a verdict of guilty of assault with intent to commit manslaughter in the case tried in Douglas county, and in Franklin county the jury returned a verdict of guilty of assault with intent to kill.

Judgment in each case was entered accordingly, and defendant assigns various errors, the first of which relates to the overruling of the application for a change of venue in case No. 31,226. In support of the application defendant submitted nine affidavits identical in terms, and which obviously had been prepared with blank spaces for affiants' names, occupations and addresses ready to be filled in upon obtaining the signatures of whatever persons were complaisant enough to sign them. This showing was supplemented by excerpts from newspapers published in Lawrence and Kansas City purporting to give the facts of the shooting of defendant's wife and brother-in-law; of their slow progress toward recovery in a hospital, and of defendant's flight and capture. This showing was also supplemented

by the affidavit of one of defendant's attorneys who averred that he had talked with a great many citizens residing in different parts of the county, and—

"With two exceptions all of said persons expressed their opinion that they did not believe that the defendant could have a fair and impartial trial in this cause in Douglas county, Kansas, because of the prejudice of the citizens thereof. That said persons further stated that they believed that the citizens of Douglas county, Kansas, have already made up their minds that the defendant, George F. Taylor, is guilty as charged in this cause and further that there is considerable feeling in Douglas county, Kansas, against said defendant. This affiant has talked to several female citizens of this county, all of whom stated that they believed and that they thought every other citizen of the county believed that said defendant was guilty and that they did not believe that a change of venue should be granted, for the reason that said George F. Taylor should be sent to the penitentiary and that he should be given no chance to escape by reason of said cause being transferred to another county."

A perusal of the circularized affidavits is not persuasive. The newspaper excerpts were ordinary news items rehashed with unimportant additions from time to time in accordance with the familiar practice of publishers when they get hold of a story of crime which they deem to be of continuing interest to their readers. There was nothing inflammatory in the excerpts, nothing likely to provoke public opinion hostile to defendant or to create a condition which would prevent a fair trial in Douglas county. And so far as the Kansas City newspaper comments were concerned, they could not be given such significance as to compel a change of venue, since those newspapers have a state-wide circulation, and any hostility they might provoke in Douglas county might be as potent in any other county to which a change of venue would be granted.

Touching the affidavit of the attorney, since it was designed to supply evidence on a matter other than one of mere formality, the trial court, without impropriety, may have ignored it altogether. (Rule 19, Canons of Professional Ethics, 135 Kan. vii.)

But the point is stressed that the state did not even take the trouble to file counter affidavits opposing the application for a change of venue. What the state did do was to submit the question on the showing made by defendant. The trial court withheld its ruling on the application for a change of venue until the jury was called and examined on their *voir dire*. When the court had heard their responses and had noted the short time required to qualify a jury, it ruled:

"There is 'an application for a change of venue in this case. The application is denied."

In view of the foregoing, this court must hold that prejudicial error in refusing to grant a change of venue does not appear. (*State v. Furbeck,* 29 Kan. 532; *State v. Knadler,* 40 Kan. 359, 19 Pac. 923; *State v. Parmenter,* 70 Kan. 513, 79 Pac. 123; *State v. Bassnett,* 80 Kan. 392, 102 Pac. 401; *State v. Tawney,* 83 Kan. 603, 604, 112 Pac. 161; *State v. Welch,* 121 Kan. 369, 372, 247 Pac. 1053; *State v. Harris,* 126 Kan. 710, 271 Pac. 316.)

Defendant cites the recent case of *State v. Taylor,* 137 Kan. 280, 20 P. 2d 628. But in that case this court did not hold that the application for a change of venue should have been granted, but merely that it was error to dispose of the motion on nonjudicial considerations. (*State v. Taylor,* supra, p. 284.)

Error in this case, No. 31,226, is also based on instructions given and refused. Those given are criticized on the ground that they did not give proper significance to the principles of Kansas law that under ordinary circumstances the father and mother of minor children born in lawful wedlock have an equal and joint right to their possession, custody and control, and neither parent has a superior right to that of the other. (*Miller v. Morrison,* 43 Kan. 446, 448, 23 Pac. 612.) The inclusion of the matter of self-defense in the instructions grew out of defendant's own testimony that Everett Christenson struck him three times as he was putting the child in the automobile. Defendant's version of the episode which led to the double shooting reads:

"As I handed the watch to Edgar, I looked up and Everett was standing north of me, just a few feet, with the baby in his arms and George Earl was standing beside him. I said, 'Hello, Everett,' and I reached down and picked up little George Earl and kissed him. As I did this Everett said, 'What's going on? Put that kid down.' Everett then advanced toward me and my wife screamed, 'Look out, Everett has got a gun.' I swung around and set George Earl on the unpacked suitcase, under the wheel. As I did this, Everett hit me in the right temple. The door kept me from falling. My wife tried to run between Everett and myself. I was hit three times. I got my hands on the gun and as I did my wife screamed and grabbed it, about the time I was hit the third blow. I thrust the gun over my left shoulder and was pushing my wife away with my left hand. Everett was behind me. My wife had her arms around my waist, pinning my left arm down. The hammer snapped down on the safety and Everett grabbed my arm and the gun was discharged in front of my wife. I swung around and pulled the trigger three more times. Everett was about three feet away from me and started to run towards the

house. The last I saw of Everett he was probably fifteen feet away. I looked around then and my wife had slumped down in the alley to the north of me. I said, 'Bessie, Bessie!' and she didn't answer me. I was pretty excited. I got in the car and drove away. I drove to Arkansas City next morning and ended up in Laredo, Texas."

Although this testimony was altogether at variance with the evidence given by the state's three witnesses—the wife, the eleven-year-old son and Christenson—the trial court treated it with impartial fairness in its instructions, which read:

"10. The defendant, as has already been suggested, has entered a plea of not guilty to the charge against him. He also claims that whatever he may have done, in connection with the shooting and wounding of Everett Christenson, was done by him in the lawful defense of his person. In connection with the defendant's claim of self-defense, I have to advise you that a person who is set upon or attacked is not required to back away or flee, but is justified and warranted in standing his ground and using such force as seems at the time to him to be reasonably necessary to repel the other party's aggression. You will see from this statement that the defendant may have shot Everett Christenson and still be innocent of any offense against the law of this state, if in shooting and wounding Christenson he was actuated and acting with a view to a lawful defense of his person and using only such a degree of force as may have appeared to him to be reasonably necessary at the time. If, from all the facts and circumstances gleaned from the evidence, including alleged threats on the part of Christenson, you arrive at the conclusion that he was attacked by Christenson and honestly believed that Christenson intended to harm him or do him some great bodily injury, he would then be justified in acting upon the facts as they appeared to him at the time. No one is justified in using any more force than reasonably appears to him at the time to be necessary to get rid of his assailant, but if he does not bring on the difficulty or provoke it, or voluntarily engage in it, he is not bound to run away to avoid it, and may resist with adequate and necessary force until he is safe.

"11. The defendant, George Taylor, and Bessie Taylor, his wife, ordinarily would have an equal right to the custody of their children, and either one of them would have the right to repel, reasonably, any invasion of their right to such custody; however, I believe that if the defendant, George Taylor, and his wife were estranged, and Bessie Taylor had for some time had the unopposed possession of her children, and there was an attempt on the part of George Taylor to take one or more of his children from her by force, over her objections, then her brother, Everett Christenson, would be justified in rendering her such reasonable assistance as might be necessary to prevent George Taylor from taking any of the children away from her. On the other hand, Everett Christenson had no right to the care, custody or control of the Taylors' children, independent of the desires or wishes of his sister, Bessie Taylor, and if, of his own motion, he interfered with George Taylor in his parental control over one of his children and resorted to force against Taylor,

then Taylor would be justified in enforcing his right to the custody of the children and the defense of his person, as set out in another instruction with reference to the element of self-defense."

Defendant inveighs against these instructions in many particulars. We think they were a fair statement of pertinent law. Defendant's objections to them are predicated, in part, on the theory that under the general principle of parents' equality of right to the possession of their minor children defendant had a right to take this child, in spite of its mother's screams, and that her brother, who was then giving her and her children the shelter and protection of a home, could not raise a finger to help her. The rule of the parents' equal right to the custody of their children under our law is predicated on the theory that there is a family and that the family is living together. In such a situation the rule of parents' equal right is practical and just. But when the family is broken up, and the mother must find a home for her children under the roof tree of a kinsman, and the estranged husband and father takes up his abode elsewhere, he has no right to invade the peace of his family at a late hour in the night for the purpose of snatching away one of his children regardless of its mother's screams and carrying it off to some unknown destination. Nor has he a right under such circumstances to shoot those who protest against such turbulent conduct. That there are limitations on the equal right of each parent to the custody of his minor child should be perfectly obvious in a case like the present where defendant's insistence on what he calls his equal right to his child's custody was to give him its *exclusive* custody, deprive its frantic and screaming mother of her equal right, to say nothing of the tragic consequences to herself and her brother which sent them both to the hospital to hover between life and death for weeks and months.

The textbooks do not help much on this subject, because the Kansas rule has its basis in the mandate of our constitution (art. 15, § 6), which has abrogated so much of the common law governing the rights of husband and wife. (*Harrington v. Lowe,* 73 Kan. 1, 19, 20, 84 Pac. 570. *Vide* Woerner's American Law of Guardianship, § 7; 1 Schouler's Marriage, Divorce, Separation and Domestic Relations, 6th ed., §§ 743, 751, 752; 46 C. J. 1225; 20 R. C. L. 634, 635.)

Defendant also contends that he had effected peaceable possession of his five-year-old son when he picked him up and set him in the seat of the automobile. That act was only a part of the whole in-

cident. The mother was screaming and still frantic at defendant's threat to take the child away, to deprive her completely of her equal right to it. We think it clear that there was a disturbance of the peace caused by defendant, and that it had not ended when the child was placed in the automobile.

The requested instructions were formulated in harmony with the theory advanced in defendant's criticisms of the instructions which the court did give. We hold that those given were fair and sufficient for the jury's guidance, and the court's refusal to give those requested constituted no error.

Turning next to case No. 31,411, defendant first assigns error in the giving of this instruction:

"7. The defendant has, as already been suggested, entered a plea of not guilty to the charge against him. He claims that if a shot fired by him from a revolver took effect upon his wife, that it was unintentional on his part; that he did not shoot at his wife and did not intend that any shot fired by him should hit her. He admits, I think, that he fired shots from his weapon, intending that they should take effect upon one Everett Christenson, and that if his wife was hit it was by a missile not intended for her but for Everett Christenson.

"In this connection, I have to advise you that if, under all the circumstances, you believe that Taylor fired at Everett Christenson with intent to commit some one of the crimes defined in the foregoing instructions, and the shot hit Bessie Taylor, then and in such a situation you will be warranted in convicting the defendant in this case of such crime as you are satisfied beyond a reasonable doubt he would have committed had the bullet hit Christenson instead of Bessie Taylor. And such conviction would be justified under such circumstances even though he did not intend the shot to hit Bessie Taylor."

It is not easy to state defendant's objections to this instruction further than to note his contention that "when he was tried (in Douglas county) on the information charging him with shooting Everett Christenson, he was tried for the entire assault and all the assaults, if any, that he had committed." That contention is not tenable. Conceding, without deciding, that if he had fired but one shot and the bullet had wounded his two victims, his act would have constituted but a single offense (2 A. L. R. 606; *State v. Schmidt,* 92 Kan. 457, 140 Pac. 843), all the evidence here is that defendant fired several shots and that his victims were wounded by different shots; and the prevailing rule of law in such circumstances is that · each shot is a separate and distinct criminal offense which renders the shooter liable to separate and distinct prosecutions, convictions and punishments. (*State v. Horneman,* 16 Kan. 452.) In cases

where two persons are wounded by separate shots fired in quick succession, although the circumstances leading up to the affray may have been identical, the separate shots do not constitute a single offense so that conviction, acquittal or jeopardy for the felonious wounding of one of the victims would bar a prosecution for the felonious assault on the other.

In *Commonwealth v. Anderson,* 169 Ky. 372, it was held:

"Where, in the same affray, the defendant shot and killed two persons with separate shots, the killing of one of them is not included in the killing of the other, the offenses not being identical, and the plea of former jeopardy will not be allowed upon a second trial on one of the indictments after a previous trial upon the other." (Syl. ¶ 2.)

In 16 C. J. 283, 284, the rule is stated:

"Although crimes are not usually identical if committed against different persons, yet by the weight of authority where the same act or stroke results in the death of two persons an acquittal or a conviction of the murder of one bars a subsequent prosecution for the killing of the other, because the killing is but one crime and cannot be divided. This rule also has been applied where the same blow produces a separate assault and battery on two different persons. On the other hand, it has been held in some jurisdictions that the murder of two persons by the same act constitutes two offenses, for each of which a separate prosecution will lie, and a conviction or an acquittal in one case does not bar a prosecution in the other. And where one assaults or kills two persons by separate shots or strokes, although in the same riot or affray, an acquittal or a conviction of one assault or homicide is no bar to an indictment for the other, as they are distinct acts."

In 8 R. C. L. 151 it is said:

"A putting in jeopardy for one act is no bar to a prosecution for a separate and distinct act, merely because they are so closely connected in point of time that it is impossible to separate the evidence relating to them on the trial for the one of them first had. Consequently a plea of former jeopardy will not be sustained where it appears that in one transaction two distinct crimes were committed. Based on this rule it has been held that if the killing of two persons is by distinct and separate acts, though done at the same time and as part of the same transaction, an acquittal for the killing of one is not a bar to a prosecution of the same person for the killing of the other."

See, also, *Gunter v. The State,* 111 Ala. 23, 56 A. S. R. 17; *Bell v. State,* 120 Ark. 530; *People v. Ochotski,* 115 Mich. 601; *State v. Labbee,* 134 Wash. 55; 20 A. L. R. 341; 1 Bishop on Criminal Law, 9th ed., § 1061.

From the foregoing it appears that the instructions excepted to were in accord with the pertinent law. Defendant's next specification of error involves substantially the same point as that urged in

his appeal in case No. 31,266, and which relates to the trial court's refusal to give certain requested instructions. As we have seen, those given were correct and sufficient, and the refusal of those requested constituted no error.

The judgments in both cases are affirmed.

HUTCHISON, J., not sitting.