THE STATE OF KANSAS v. WILLIAM G. McCOY.

No. 14,180. (79 Pac. 156.)

SYLLABUS BY THE COURT.

1. CONTINUANCE—*Refusal Approved.* The conduct of the district court in overruling an application for a continuance approved.

2. EVIDENCE—*Contents of Letters.* Secondary evidence of the contents of letters shown to be in existence, and within the jurisdiction of the court and accessible to its process, is inadmissible.

3. PRACTICE, SUPREME COURT—*Review of Instructions.* A single instruction cannot be excised from the body of an elaborate charge and treated as if it contained the sole utterance of the court to the jury. Every part must be considered in its proper relation to the whole charge.

4. ——— *Criminal Appeal — Bill of Exceptions.* In a criminal case exceptions to instructions have no place upon the journal of the court, and can be brought upon the record in no other manner than by a bill of exceptions.

Appeal from Elk district court; G. P. AIKMAN, judge. Opinion filed January 7, 1905. Affirmed.

*C. C. Coleman,* attorney-general, and *Jay F. Close,* assistant attorney-general, for The State.

*Nearing & Townsend,* for appellant.

The opinion of the court was delivered by

BURCH, J. : This tale of youth and love and crime and death is briefly told. In the autumn of the year 1903 Cora Palmer and Will McCoy ran away and were married. She was seventeen and he was twenty. They stayed for a little while with his parents in Kansas City, and then she was called to her former home in Longton by the fatal illness of her father. After her father's funeral she returned, but soon went home again to her mother. This time her husband accompanied her, remained with her a week, and then resumed his work as a machinist in Kansas City. When they were together they seemed to be happy, but as the days of their separation wore away his mood changed and he became worried and anxious.

Some one carried to him, but not in kindness, a story of Cora's skating upon the river on Sunday afternoon with some young men, one of whom walked a part of the way home with her. Her letters caused him agitation, and in the latter part of January, 1904, he wrote the clerk of the Howard county district court to know if she had sued for a divorce. On February 25 he went to Longton, and the former light-hearted relations of the young people were apparently renewed. One evening he seemed to be somewhat depressed on account of his inability to find congenial work, but the kind words of Mrs. Palmer, with whom they lived, restored him to cheerfulness. Occasionally they became a little piqued at one another, but only for the time being, and they were never heard to quarrel. Once, however, Cora took his revolver to her mother for safe-keeping, remarking at the time, "you don't know what an awful temper he has." On the morning of April 12, Will asked his wife to drive out with

43—70 KAN.

him to plant a rose-bush on her father's grave, but she declined to go, saying to her mother that he merely wanted to take her out and quarrel with her.   Later that morning the two came into the house together and went up-stairs.   He went into their room, and Cora went into her mother's room, sat down beside her mother on the bed, told her Will was going to Kansas City on the 10 : 46 train, and asked for a check for some money he had left for convenience with Mrs. Palmer.   Presently he was heard to call, "Cora!"   As if in her heart she felt her doom draw nigh, she said, "Ma, I am afraid."   Mrs. Palmer, however, reassured her, and she arose, looked at her mother and walked to immediate death at her husband's traitorous hands in the adjoining room.   Hearing pistol shots, the terrified mother rushed in and found the hapless girl-wife lying composed and still upon the floor with a bullet-pierced brain, while the defendant lay upon his face some distance away from her, apparently dead, with his revolver near his right hand.   A self-inflicted wound on the right side of his head proved inconsequential, and he was immediately taken into custody.   In due time he was tried for his crime, convicted of murder in the first degree, and sentenced to be hanged.   The principal defense was that a fateful inheritance lurking in his blood made sudden conquest of his reason, and left upon his memory no trace of the tragic circumstance.

In this appeal it is urged that the defendant was forced to trial without having been allowed sufficient time to prepare his defense.   The preliminary examination was not held until April 25, thirteen days after the homicide.   At the preliminary examination the accused was represented by counsel who afterward defended him.   The information was filed April 30, and a copy of it was delivered to the defendant on the

same day.  On May 2 final arrangements were made
by the defendant for the assistance of counsel at his
trial.  On May 3 the case was called for trial.

In his application for a continuance the defendant
placed stress upon the difficulty he had encountered
in securing counsel.  He was, however, duly repre-
sented, and, if his efforts to employ counsel had wholly
failed, and the court had been obliged to appoint an at-
torney to conduct his defense, such facts would scarcely
have been sufficient to carry the case beyond the term.

The defendant further claimed to be out of health
physically and mentally, but it was not shown that
he required medical attention or treatment; that he
was unable to attend the trial, or that he would suffer
any particular inconvenience in doing so ; and a close
scrutiny of the careful phraseology of the affidavits of
himself and his attorney leads to the conclusion that
it was not necessary to postpone the trial on account
of his mental condition.

The absence of a witness known by the name of
Boone was urged, but the testimony believed to be
obtainable from him was presented in full by an affi-
davit which the state consented should be read as a
deposition.  It was asserted that if time were given
it could be shown that defendant was a young man of
good character, but the evidence to that effect was not
set out, no witnesses by whom it could be proved were
named, and the places of residence of such witnesses
were not disclosed.  The defendant also desired the
presence of his mother as a witness, but no attempt
was made to set forth what her testimony would be.
It was broadly asserted that she was the only person
who could prove the defendant's family history with
reference to insanity, and the defendant's physical
and mental condition before the homicide, but such
statement was insufficient to comply with the require-

ments of the law. Therefore, under all the circumstances of the case, and upon the showing made, the motion for a continuance was properly overruled.

At the trial, the statement in the affidavit for a continuance relating to the importance of Mrs. McCoy's presence as a witness was shown to be untrue in fact. All the matters stated to be within her exclusive knowledge were fully proved in copious detail by the testimony of the defendant's father, sister, uncle, and grandmother. If it had been error to overrule the motion for a continuance upon the ground of her absence the defendant was not prejudiced.

As first presented to this court, the record failed to show that, upon the preliminary hearing, the examining magistrate found that a crime had been committed and that probable cause existed for believing the defendant to be guilty of its commission. The state having suggested a diminution of the record, the missing matter has been supplied, and all assignments of error based upon its absence are therefore groundless.

It is said that the court erred in refusing to permit the defendant to show why letters, the contents of which were material, were not in court, as a basis for secondary evidence of their contents. The record does not warrant the assertion. The witness having control of the letters testified that they were in Kansas City, Kan., and that she did not bring them because she came to the trial in response to a telegram, and, in her haste, overlooked them, and did not have time to get them. The record then discloses the following:

"Ques. When did you receive that telegram? Ans. I got it about six o'clock.

"Q. About six o'clock when—what day? A. Tuesday evening.

The State v. McCoy.

"Q.  That was yesterday evening?   A.  Yes, sir.

"Q.  What time did you have to leave Kansas City?"

By the court.:  "I do not see that this cuts any figure."

By Attorney Hudson :  "I was trying to account for not having the letters.   The theory was to lay the foundation — equivalent to having them lost.   It was impossible to get them."

Since the examination had proceeded far enough to show that the letters themselves were in existence, were within the jurisdiction of the court, and were accessible to its process, the theory of counsel was not tenable, and the conduct of the court was clearly correct.

The court by instruction No. 22 advised the jury as follows :

"It is claimed by the defendant that at the time of the commission of the act he was insane, and therefore, not legally responsible for the act.

"You are instructed that where the defense of insanity is set up it does not devolve upon the defendant to prove he was insane at the time of the commission of the alleged offense by the preponderance of the evidence, but if upon the whole of the evidence introduced on the trial, together with all the legal presumptions, as explained in these instructions, under the evidence, the jury entertains a reasonable doubt as to whether the defendant was sane or insane, then in that case he must be acquitted."

It is urged that this instruction eliminated all question as to who fired the fatal shot, and in effect told the jury that the defendant admitted the killing to be his own act.   The argument is somewhat hypercritical and involves the hoary fallacy of excising a single instruction, or a single sentence of an instruction, from the body of the charge, and treating it as if it contained the sole utterance of the court to the jury.

In the eighth instruction the court enumerated seriatim the facts to be found by the jury beyond a reasonable doubt before they could convict. Among them were the following :

"*First*. That Cora McCoy was shot and killed as charged and stated in the information.

"*Second*. That the defendant, William McCoy, shot and killed her."

When the law relating to mental capacity to commit crime was applied by the instructions specifically to the defendant it was with the premise that the jury should believe from the evidence beyond a reasonable doubt that the defendant committed the act charged in the manner alleged in the information, and the same necessity was imposed time and again in page after page of the instructions. The assignment of error relating to instruction 22 cannot be sustained.

Technically, the defendant is not entitled to question the propriety of instruction 22. In a criminal case exceptions to instructions can be preserved in no other manner than by a bill of exceptions. They have no place upon the journal of the court. In this case the journal entry notes an exception to all the instructions, but the bill of exceptions recites that all instructions given by the court were excepted to "excepting instruction No. 22." However, in order that the defendant might not feel that a mere oversight in the matter of making up the record of his trial has caused him to suffer capital punishment, the court as a matter of grace has read instruction 22 in connection with those to which exceptions were duly saved, with the result already announced.

The record is free from material error, and the judgment of the district court is affirmed.

All the Justices concurring.