No. 39,055

THE STATE OF KANSAS, *Appellee,* v. MERLE WILLIAM MARTIN, alias WILLIAM MERLE MARTIN, *Appellant.*

(265 P. 2d 297)

Opinion filed December 12, 1953.

*Roy W. Cliborn,* of Mission, argued the cause, and *Elmer Hoge,* of Overland Park, was with him on the brief for appellant.

*John Anderson, Jr.,* special assistant county attorney, of Olathe, argued the cause, and *Harold R. Fatzer,* attorney general, *Paul Wilson,* assistant attorney general, of Topeka, and *James R. Bradley,* county attorney, of Olathe, were with him on the brief for appellee.

The opinion of the court was delivered by

HARVEY, C. J.: On September 26, 1952, the county attorney of Johnson county filed with the clerk of the district court of that county an information which in appropriate language charged Charles Wilford Isgrigg and Merle William Martin with four felonies in separate counts committed on or about the 23rd day of June, 1952. The first count charged first degree murder of Willard Carver,

a deputy sheriff of Johnson county; the second count charged assault with intent to kill of Floyd Gaunt, another deputy sheriff; the third count charged the burglary of the Moss Davis home at 98th and Mission Road, Overland Park in Johnson county; and the fourth count charged the larceny of personal property of the value of more than $20 from the Moss Davis home. Isgrigg was taken into custody the next day after the offenses were alleged to have been committed, and Martin was taken into custody on or about August 31, 1952. Both were in the custody of the sheriff of Johnson county. A severance of the trial was requested and Martin's trial began on November 17, 1952. It continued for about two weeks. The jury found the defendant Martin guilty on all counts and on the first count fixed his punishment at death. His motions for a new trial and in arrest of judgment were considered and overruled and he was sentenced to death upon the verdict of guilty of the first count of the information. He was also sentenced to terms of years of imprisonment upon the verdicts of guilty of the second, third and fourth counts, which sentences were not to be served or begin to run excepting in the event the sentence on the first count was not carried out. The defendant has appealed.

We first note the defendant has never, at any time, told the court, or the court and jury, that he did not commit the offenses charged against him. When he was arraigned upon the information he stood mute and the court entered a plea of not guilty for him, and upon the trial he did not take the witness stand in his own behalf. In this court there is no contention that defendant did not commit the crimes charged. The sole defense made, or attempted to be made, was that of insanity.

Since the facts pertaining to the felonies of which defendants were charged are not controverted they may be summarized as follows: Moss Davis and his wife lived on the corner of 98th street and Mission Road in Overland Park, Johnson county. About the 10th of June, 1952, they left for a month's vacation, having arranged with Mrs. Irene Bruce and her husband, who lived about one-half mile away, to care for and look after their premises while they were gone. On Sunday, June 22, 1952, Mrs. Bruce and her husband were at the Moss Davis home all day looking after everything about the premises. They left about 6:00 o'clock p. m. but before doing so they saw to it that the windows and the doors of the house were locked, and also the two gates which lead into the premises from the

highway. They went to their own home; changed their clothes and went to the airport for dinner; had tire trouble and were delayed coming home; stopped at their home again to get their work clothes for the next day, and reached the Moss Davis home about 11:00 o'clock p. m., or a few minutes thereafter. As they drove up to the place they first noticed that one of the gates was open. They drove into the yard and stopped near the side door and Mrs. Bruce went to it. She found the door open; that the glass in the door had been broken; she went in on a small porch and found the wood-work of the door to the room of the house had been chiseled away along the side of the door and that door was open. She went into the house and found that everything "looked like a tornado had struck it." The drawers of the furniture had been taken out, the contents thrown on the floor, and the house had been thoroughly ransacked. She called her mother and told her what she had found and was advised to call the sheriff's office, which she did. The call reached the sheriff's office at 11:25 p. m.; the sheriff instructed Herbert V. Beatty, a deputy sheriff, to investigate. He went to the Moss Davis home, arriving there about 11:30 p. m. and was there perhaps about twenty minutes, found the situation much as described by Mrs. Bruce and together they looked through the house. No attempt was made at the time to get a complete list of things that were missing. Mrs. Bruce did notice that a small radio, a type-writer, the bed linen from one twin bed, a foam pillow, a bedspread and blanket were missing. Officer Beatty reported back to the sheriff's office. When he made his report two deputy sheriffs, Willard Carver and Floyd Gaunt, were present and were told by the sheriff to take a patrol car and see what they could find. Shortly after midnight, while Carver and Gaunt were patrolling the north-west part of the county, they had a radio call from the sheriff to go to the William A. Barth place from which there had been a report that someone was trying to steal their car. This place is in the northwest part of the county about halfway between De Soto and Bonner Springs. They were there informed Mrs. Barth had heard the engine on the car start; she looked out the window; she saw two men with a flashlight trying to push it, she yelled at them and asked what they were doing and told them to get out; they left the car and went in the direction of what is known as the Gilbert corner not far from the Barth residence. Mrs. Barth had no description of the men except that they wore light-colored shirts. The officers went over

toward the Gilbert corner. At this place there is an east and west road with a road leading from it to the north. This road did not extend through the east and west road to the south. The corner it made at the east and west road is spoken of as a "T" corner. This road to the north crosses a bridge about one hundred feet or more north of the corner. Looking down that road they saw a dark-colored automobile in the ditch or on the shoulder of the road, and drove to it; no one was there; they took the license number; found on the front seat a German Luger pistol. In the back seat they saw what appeared to be a quantity of material of some kind covered with a blanket and also noticed a foam pillow. They drove back to the corner and stopped their car where it was partly concealed by timber and brush, and waited. Soon thereafter a pickup truck, in which two men were riding, came from the north; passed the car at the side of the road, going on south to the Gilbert corner, turned around and went back to the car at the side of the road and pulled up to it and stopped in such a way that the rear of the truck was near the front of the car and the lights on the truck were put out. At that time officers Carver and Gaunt started to walk toward the car and truck. They separated somewhat so they would approach from different directions. When they got within about fifty feet of the car and truck Carver called out to the men who had driven up in the truck, "Come out with your hands up. Police." Gaunt gave the same order at about the same time. The officers also turned on their flashlights; firing immediately started from the truck and the car at the side of the road. The officers returned the fire. Gaunt found a handy telephone pole which he got behind and emptied his revolver. He heard Carver say, in a weak voice: "Gaunt, help! Help, Gaunt!", and Gaunt went over to where Carver was and found he had been shot. Gaunt felt of his pulse; tried to listen to his heartbeat, and found no evidence of life. He went back to his patrol car and reported the facts to the sheriff who sent other officers and an ambulance. Word of the incident was spread in the community and an intensified search was made for the persons who were at the truck and automobile, and who did the shooting.

An autopsy disclosed that Willard Carver's death was caused by a bullet from a .38 caliber Colt revolver which entered his body from the right side, a few inches below his armpit; passed through the lung cavity; severed a vertebra of the backbone and the spinal column and lodged in the flesh in the left side. His death occurred within a few minutes at the most.

There had been a heavy rain in the area of the Gilbert corner the day before the homicide. The roads were dirt roads and were very muddy. Going north from the bridge there was a hill. The automobile at the side of the road was a Ford, '49 or '50 model. Apparently this was being driven up the hill, had trouble making it and backed down and in doing so got on the shoulder or in the ditch at the side of the road. When examined the Ford automobile contained many pieces of personal property which belonged to Moss Davis and his wife, obviously taken from their home earlier that night.

The next day, while some persons were passing along the road to the north of where the shooting occurred, Isgrigg came out of the woods and surrendered. He was taken to the jail at Olathe, the county seat of Johnson county, where he was held until after the trial of Martin when he entered a plea of guilty as charged and was sentenced to life imprisonment. Martin fled. Peace officers and F. B. I. were notified and made an intensive search for him. Martin was finally picked up at St. Louis, and turned over to the sheriff of Johnson county on August 31, 1952.

Much of the trial had to do with the flight of Martin. The pickup truck, which was at the scene of the shooting, had been taken that night from the yard of Mike Van Schoelandt who lived about one-half mile north of the Gilbert corner. The next morning after the homicide a truck belonging to Gerald E. McLaughlin was found on the street in Olathe. Mr. McLaughlin lives a mile south of the Gilbert corner. It was also discovered that a Hudson automobile belonging to Hugh Miller had been taken from a place in front of his home about a block from the place McLaughlin's truck had been left.

Further investigation by the officers disclosed the movements the day before and the night of the homicide and Martin's movements thereafter until he was taken into custody are substantially as follows: Martin and Isgrigg were brothers-in-law. Each of them had a prison record. Isgrigg was a taxi driver in Joplin, Mo.; Martin was there a part of the time. On June 22, 1952, they, and Roberta Rae Carter, Isgrigg's friend, drove from Joplin, Mo., to Olathe, Kan. Roberta had a room at a hotel and the men went about their business. Sometime between that night and the next morning she left with Martin, apparently in the Hudson automobile which was missing at Olathe that morning. They passed through Hutchinson

and went on into Nebraska, and from there to the neighborhood of Chicago and Valparaiso, Ind., in a Chevrolet where that was left and they continued in a Buick automobile which had papers in the glove compartment indicating it belonged to Charles E. Foster, Jr. They appear to have driven that car approximately 9,000 miles, as far west as Las Vegas, Nev., as far east as Washington, D. C., and got into Birmingham, Ala., about the 24th of August sometime in the night. They left that car parked on the street with Roberta Rae Carter in it where she went to sleep. Later that morning the police officer at Birmingham took into custody Roberta Rae Carter and the automobile in which she was sitting. The car still had some of the things in it taken from the Moss Davis home. About one hundred feet from where the automobile was parked in the street was the home of Stella Mae Dean and her son. About 8:00 p. m. a man came into Mrs. Dean's bedroom with a flashlight; at first she thought it was her son. She asked what he was doing and the man shoved her back and struck her on the head with the flashlight or a gun; she called her son and when he came to the door the man said, "If you come in here I'll shoot you." The man hit her again on the head and ran out of the door leaving his flashlight. Mrs. Dean later identified the man as the defendant Martin. Clarence Satterwhite, of Birmingham, operated a cafe about one hundred feet from Mrs. Dean's residence. Behind his place of business and across the street at the corner is a vacant lot where he burned trash and boxes. On September 9, 1952, while he was burning trash he found a .38 caliber Colt revolver about sixteen steps from the curb of the street. This revolver was turned over to the police and sent to the F. B. I. at Washington, D. C.

On June 23, 1952, Dr. Victor B. Buhler, pathologist, performed an autopsy on the body of Willard Carver, He recovered the bullet from Carver's body and delivered it to the sheriff who sent it to the F. B. I. laboratory at Washington, D. C., for ballistic examination. Marion E. Williams, a special agent of the F. B. I. of Washington, D. C., qualified with twelve years experience in the laboratory in the examination of firearms, testified as a ballistic's expert; that he received the .38 caliber special bullet sent him by the sheriff; that he also received the .38 caliber Colt revolver sent to him from Birmingham, Ala. He carefully examined these and his findings were that the bullet removed from Carver's body was fired from the Colt revolver. On June 23, 1952, police department

officers in Kansas City, Mo., examined the Ford automobile, which was in the ditch and the parties were trying to pull it out when the homicide was committed, and lifted fingerprints from the back of the rear vision mirror. These were compared with the fingerprints in the police files of Kansas City, Mo., and found to be identical to those of one William Martin which were on file in the department, and identical also with the fingerprints of defendant made after he was taken into custody and returned to the sheriff at Olathe. The evidence disclosed that deputy sheriffs Carver and Gaunt were using only Smith and Wesson revolvers. After Isgrigg was taken into custody he lead the officers to the place where he came out of the woods the next day after the homicide and near by a tree close to that place he pulled out of the ground a Smith and Wesson revolver which had in 'it six live cartridges. The ballistic's expert testified that the bullet which had been taken out of Carver's body could not have been fired from a Smith and Wesson revolver but was fired from a Colt revolver. That this was accurately determined from the fact that in the Smith and Wesson revolver the ribs in the barrel turn to the right, while those in the Colt revolver turn to the left and that marks on the bullet which killed Carver clearly showed it was fired from a Colt revolver.

On October 3, 1952, under proceedings to which no complaint was made, the court appointed Mr. Elmer Hoge, of Overland Park, an experienced attorney, to represent the defendant Martin. Later, and on November 5, 1952, at the request of Mr. Hoge, the court appointed Roy W. Cliborn, of Mission, also an experienced attorney, as additional counsel for Martin. Together they represented him throughout the trial and here. At the trial they filed many motions, most of which were denied. These rulings are assigned as error. We consider those *seriatim.*

1. The state should have been required to elect as between the count for murder and the three counts charging lesser offenses. Before the trial defendant filed a motion to strike from the information counts 2, 3 and 4. This was considered and overruled. At the close of the state's evidence defendant moved that the state be required to elect upon which count it would go to the jury. This motion was overruled.

Counsel for appellant contends that his defense on the first count which charged murder in the first degree and for which a death sentence might be imposed, was prejudiced by the fact that at the same hearing he was compelled to defend on count 2, for assault

with intent to kill; on count 3, for burglary; and on count 4, for grand larceny.

The question when two or more counts charging different felonies may be set out in different counts in the same information has received attention of this court on several occasions. Perhaps the opinion in *State v. Thompson*, 139 Kan. 59, 29 P. 2d 1101, contains the best discussion which we deem applicable here. There two defendants were tried together on an information charging them in the first count with rape of a woman, and in a second count with robbery of a man of an automobile. The evidence disclosed the offenses were closely related in time and place. In the course of the opinion the court had occasion to say:

"A charge of murder in the first degree includes homicides of lesser degree. If murder in the first degree were a capital crime while murder in lower degrees and rape were not, this court perceives no reason why a charge of the capital crime committed in connection with perpetration of rape, and a charge of rape, could not be joined."

. . . . . . . . . . .

"To illustrate: A man breaks and enters a dwelling house in the nighttime with felonious intent, and so commits burglary. He steals a large sum of money and much valuable jewelry, and so commits grand larceny. He ravishes a woman in the house. On being discovered in the house, he kills a man, and so commits murder. To conceal his crimes, he sets fire to the house, which burns, and he thus commits arson. These exhibitions of conduct are so concatenated in time, place, and circumstance, they constitute one composite event. The various felonies are separate, not in relation to each other, but only in definition in the statute book, and there is no reason why they should not be joined in separate counts of one information."

. . . . . . . . . . .

"The court does not deem it wise to state a fresh generalization respecting joinder of felony charges in the same information. To do so might hinder further development of the law to include unforeseen exceptional cases."

In *State v. Neff*, 169 Kan. 116, 218 P. 2d 248, defendant was charged in one count with the murder of his wife by poison, and in the same information in a separate count with the murder of his brother-in-law by shooting him at a different time and place. The court reviewed the authorities and in the opinion stated what we regard as a settled rule in this state:

"Where offenses constitute one comprehensive plan, transaction, or one offense is a corollary to the other they may be joined and this is true whether they be of the same general character or not."

Our later cases *State v. Aspinwall*, 173 Kan. 699, 252 P. 2d 841, and *State v. Aldrich*, 174 Kan. 335, 255 P. 2d 1027 are to the same effect. We think the court correctly ruled on this point.

2. The court erred in overruling defendant's motion for change of venue. On October 15, 1952, defendant filed a motion for change of venue upon the ground that the minds of the inhabitants of Johnson county were so prejudiced against defendant that a fair trial cannot be had in the county. This was supported by a large number of news items printed in the newspapers of Johnson county and in the Kansas City Star and Times which has an extensive circulation in the county. It was also supported by eleven affidavits, identical in form except the signatures of the affiants, to the effect that in the judgment of the affiants an impartial jury to try the defendant could not be obtained in the county. It was also supported by the affidavit of Mr. Hoge, one of the defendant's attorneys, to the effect that he had traveled over the county; talked to a great many people who had expressed to him the view that an impartial jury could not be obtained in the county but who refused to sign affidavits, naming five persons who had so refused. This last affidavit might well have been ignored by the court. See *State v. Taylor*, 138 Kan. 407, 26 P. 2d 598, but apparently the court considered all the affidavits. A number of affidavits were filed by the state opposing the change of venue. These were individual affidavits in which the affiant stated his place of residence, business, and that he had talked with many persons and that none of them had expressed the view that the defendant was not entitled to a fair trial, or that he was prejudiced in such a way that defendant could not have a fair trial in Johnson county. The sheriff's affidavit made it clear that there had been no public disturbance against either of the defendants when they were brought to jail, or at the jail, or when they were at the hearing of preliminary examinations. In denying the motion the court discussed the matter to some length and stated that there had been no individual, or group of individuals, showing any particular interest in when the trial was to be had, or what disposition should be made of the case; that at the hearing then before the court only four persons were in the court room, three of whom were attorneys with business there; took account of the fact that the county had a population of almost 80,000; many of them well educated and of high standing in business and professional circles. The motion for change of venue was denied. It was worthy of note that when the trial was had there was no difficulty in getting a jury whose voir dire examination indicated they were intelligent, fair minded jurors. There was no contention at the hearing of a motion

for a new trial, that a fair and intelligent jury had not been selected, neither is such a contention made in this court. We think there was no error in the ruling of the court on this point.

3. The court erred in not granting defendant a 30 day continuance of his trial. The record shows the information was filed in this case on September 26, 1952, and a copy of it was served upon the defendant on that date; that an attorney was appointed for defendant on October 3; that on October 23, the case was set for trial on November 17; that a second attorney was appointed for defendant on November 5, and that on November 15, only two days before the case was set for trial, the motion for a thirty-day continuance was filed. This motion was supported by the affidavit of Mr. Hoge to the effect that he had endeavored to get records from the Missouri state hospital for the criminal insane, pertaining to defendant; that the records appeared to be misplaced, having learned that under a subpoena they had been sent to the United States district court, the records of which disclosed they had been sent back to the hospital on April 22, 1948, following their use in the United States district court. Counsel for defendant argued that they had been busy in connection with the motion for change of venue, also that they had brought habeas corpus proceedings in the district court for defendant's discharge upon the ground that the evidence before the magistrate court at the preliminary examination was insufficient to justify the holding of defendant for trial; that upon a hearing the writ had been denied, and upon a motion for new trial the county attorney had requested permission to introduce additional evidence which was heard by the district court and the writ was again denied on November 10. Defendant appealed from that ruling to the supreme court which appeal was dismissed. On a motion for new trial one of the grounds was the alleged error of the court in denying this motion for continuance. At that time no showing was made that prejudice to defendant existed by reason of denial of the application for continuance, or that the evidence at the trial would have been different than that which was actually presented to the court. The granting of a continuance to a defendant in a criminal case is a matter within the sound judicial discretion of the trial court. See *State v. Wiswell*, 128 Kan. 659, 280 Pac. 780. See also *State v. Badgley*, 140 Kan. 349, 37 P. 2d 16; *State v. McCoy*, 70 Kan. 672, 79 Pac. 156; *State v. Hill*, 145 Kan. 19, 64 P. 2d 71. We think no showing of error on this point was made.

4. Denial of information and refusal to permit examination of bullet, gun and fingerprints.

On October 27, defendant filed a motion for a bill of particulars, requesting, among other things, that the state disclose the caliber of the bullet with which Carver was shot, the make and type of gun, the angle at which the bullet penetrated his body and the course it took, and to set forth any report of ballistics tests on the bullet and gun. This motion was overruled and the appellant complains of that ruling saying, "The nub of our complaint is that the preliminary did not sufficiently apprise the defendant of the nature of the evidence he was required to meet."

The record disclosed that at the preliminary examination held on September 5, deputy sheriff Floyd Gaunt testified to the incidents pertaining to the homicide and the death of Willard Carver. The fingerprint expert testified the fingerprints found on the back of the mirror on the car were identical to those of the defendant's. At that hearing the defendant did not have an attorney but he cross-examined each of the witnesses presented by the state. Reading the transcript of that cross-examination, it appears to have been intelligently done. Thereafter defendant filed habeas corpus proceedings upon the ground that the evidence was insufficient to justify holding him for trial. This came on for hearing before the district judge and was denied. A motion for new trial was filed and the county attorney asked permission to introduce additional evidence and what amounted to a second examination was held. A number of witnesses were called. Counsel for the defendant cross-examined each of them and they had authority to call witnesses on accused's own behalf. Anything they wanted to know about the bullet, the make and type of gun, the course of the bullet in the body of Carver, the reports of ballistics tests on the bullet and gun were all open to them. There is no occasion for a bill of particulars covering those matters and the court did not err in refusing.

5. Roberta Rae Carter's statement. It appears that during the investigation information was obtained to the effect that Roberta Rae Carter might be an important witness in the case. At sometime prior to the trial she was interviewed by the county attorney, the sheriff, and Mr. Carl Hansen, who identified himself as a member of the F. B. I. Each of them asked her some questions which she answered. These questions and answers were taken down by a court reporter and later transcribed. Deeming her statement material evidence for the state the county attorney had endorsed her

name on the information as a witness. Miss Carter had been charged in the U. S. district court of Kansas for violation of the Dyer Act under the name of Roberta Rae Martin. Defendant and his counsel sought to keep her from being used as a witness and they advised the court that she was the common-law wife of the defendant and as such could not be compelled to testify. A hearing was had upon that matter before the court, and out of the presence of the jury, at which time defendant testified at some length and other evidence was introduced. The trial court concluded that the evidence did not justify a finding that she was the common-law wife of the defendant. At the time of the trial she was being held under the United States charge in the Wyandotte county jail. She was brought to Olathe under subpoena by the state to testify in this case. Before she was called to the witness stand she was visited in the county jail by counsel for defendant and it appears she was told she might refuse to answer any questions propounded to her of a character which would tend to incriminate her. When she was called to the witness stand to testify she declined to answer any questions upon the ground that the answer would tend to incriminate her. We pass comment upon the conflicting views of defendant's counsel as to whether they represented the witness further than to say that they finally concluded they did not represent her. The county attorney then asked leave to cross-examine the witness. There was a short hearing before the court, not in the presence of the jury, at which the court advised the county attorney that he might read to the witness questions propounded to her at the interview with the county attorney, sheriff, and Mr. Hansen, and her answers thereto and ask her if those questions were asked and those answers returned and the witness could either answer or refuse to do so. Returning to the court room before the jury that was done. The county attorney proceeded to read to her a question asked in the previous interview and the answer she gave to it and ask her if that question was asked and she made the answer. In each case she declined to answer upon the ground that her answer would tend to incriminate her. At the close of that reading defendant moved the court for a mistrial. This motion was overruled and the court said: "Members of the jury, directing your attention to the witness Roberta Rae Carter, or Martin, who appeared before you yesterday and did not testify, the alleged questions and answers called to her attention by the county attorney from an alleged earlier statement by her did not become her testimony or evidence; they

are not evidence and must not be so considered by you." In this court counsel for appellant objects to the ruling of the court permitting those questions and answers to be read. The objection lacks merit. See *State v. Olthoff*, 141 Kan. 70, 85, 40 P. 2d 384; *State v. Cole*, 136 Kan. 381, 15 P. 2d 452; *State v. Parks*, 133 Kan. 568, 1 P. 2d 261; *The State v. Smarsh*, 117 Kan. 238, 231 P. 52.

6. Attempted theft of Barth vehicle and theft of McLaughlin and Miller vehicles by unidentified persons. Appellant contends the court erred in admitting the evidence pertaining to those transactions. That point is not well taken. The evidence offered by the state tends to show that after the burglary of the Moss Davis home and the larceny of property therein the persons who did it drove a 1949, or 1950, Ford car with much of the stolen property in it to a place in the northwest portion of the county; that they got the car stuck on a muddy hill; that they went to the Barth home and undertook to steal the Barth automobile and were discovered. The men who were doing that wore white, or light-colored, shirts. Officer Gaunt testified that one of the men at the place of the homicide was wearing a white shirt. This tends to connect those attempting to take the Barth car with the defendant. Directly after the homicide the two men, who later proved to be appellant and Isgrigg, fled from the scene; that apparently they separated, Isgrigg going into the woods to the north and the next day came out and, in effect, surrendered himself to persons who were looking for him. The flight of Martin was in some other direction. Someone took the McLaughlin truck and drove it to Olathe, some twelve or fifteen miles, and left it on the street and someone took the Miller Hudson automobile from Olathe. Later developments tended to show that the person who took those cars was the appellant Martin. The state had not charged defendants with the larceny of any of those vehicles, it was attempting to show the possible means of the flight of Martin. Flight from the scene of a crime by the one who perpetrates it may always be shown. In *The State v. Stewart*, 65 Kan. 371, 69 Pac. 335, it was held:

"The facts of flight, concealment, disguise, denial of identity, change of name, and like acts, done by one accused of crime, after the commission of the offense, may be received in evidence, with all the other facts and circumstances in the case, as bearing on the question of the guilt of defendant."

See, also, *The State v. Kesner*, 72 Kan. 87, 82 Pac. 720.

7. Flight and arrest of Isgrigg, recovery of the gun pointed out

by him long afterward. There was no error in showing the flight of Isgrigg. Sometime later, perhaps August 31, in company with two deputy sheriffs Isgrigg went to the place where he came out of the timber and gave himself up. Near there he located a Smith and Wesson revolver stuck in the mud, barrel down, which he pulled out and which, when examined, the chamber was found to contain the full number of live cartridges. Counsel for appellant cited Wharton's Criminal Evidence, section 721, to the effect that, "Since no act or declaration of a conspirator will affect a co-conspirator or co-actor, which is made after the conspiracy has been abandoned or terminated, or which does not further the conspiracy, the flight of a co-conspirator is inadmissible against the accused person on trial. . . . Upon the same principles, an attempt of a co-conspirator to escape has been held inadmissible against the accused on trial." The same section goes on to say: ". . . it has been held that a short flight in the nature of an attempt to escape has been admissible on the ground that it occurred immediately after the commission of the homicide charged, and was therefore a part of the *res gestae* of the crime."

Under this section Isgrigg's flight was a part of the *res gestae* and was admissible. The court permitted the evidence of Isgrigg's finding the Smith and Wesson revolver upon the theory that it was offered so as to exclude the possibility that it was the homicide weapon. There is nothing in the record as to just what Isgrigg said on that occasion, or at any time. He was not a witness in the case and there is no testimony in the record quoting him on any matter. In fact, we are told in the brief that he refused to say anything about the offenses or to name who was with him although he was interrogated repeatedly.

8. Comparison of fingerprints found at scene of crime with fingerprint card not properly identified as pertaining to defendant. Under this head counsel for appellant complains of the fact that when Leon Hines, the fingerprint expert from the Kansas City police force, examined the Ford automobile for fingerprints he went to the file of fingerprints in the police department of Kansas City and found a fingerprint under the name of William Martin which was identical with one of the fingerprints he found on the Ford automobile and that later, after the defendant Martin was taken into custody, Hines took his fingerprints and found that the three were exactly identical. We see no error in the showing of the

fingerprint in the Kansas City file. It cannot be said that it was not properly identified as to pertaining to the appellant.

9. (a) Hearsay testimony of Andrew Smith. (b) Improper admission of demonstrative evidence. And 10, Claimed assault upon Stella Mae Dean. When the Buick automobile, in which Roberta Rae Carter was found in Birmingham, Ala., on August 24, 1952, was taken to the police station the car and its contents were examined by Andrew M. Smith, of Birmingham, a special agent for the F. B. I. He testified that he found in the car several papers, or documents, one of which was a receipt made out to Merle William Martin from the Missouri Motor Vehicle Registration department dated June 10, 1952, and an identification card containing the addresses 407 Pine street, 304 North Pearl; a blood donor's certificate made out in the name of Mr. Merle W. Martin; a leather billfold containing identifying cards of Charles W. Isgrigg, and in the glove compartment of the Buick he found an owner's service policy for a 1952 Buick automobile made out in the name of Charles E. Foster, Jr. We do not understand appellant's complaining of Smith's testimony of finding those items. There were many other things in the automobile which were described. Appellant's contention is that it was error to describe those other things; a German Luger pistol; a .38 caliber Smith and Wesson revolver; a Savage rifle; also a large quantity of jewelry; four suitcases; a camera; binoculars; check protector; several watches; an electric iron; cigarettes; a child's coat; an electric fan; cartridges, and other items. These are the items which counsel for appellant speak of as demonstrative evidence. We think this testimony was not seriously objectionable. It tended to show the type of business for which the automobile was used.

10. The witness also testified that the Bright Star flashlight which Mrs. Dean's testimony indicated was left at her residence was brought to the police station by Mrs. Dean's brother who told the witness where it had been found. This is the hearsay testimony objected to by counsel for appellant. We think that does not constitute material error. In this connection it should be remembered that after defendant's arrest in talking with the sheriff he clearly connected himself with Roberta Rae Carter and the Buick automobile in Birmingham, and the claimed assault upon Stella Mae Dean. Mrs. Dean testified that defendant came into her home in Alabama and into her bedroom and when she got up and remonstrated with him he assaulted her by striking her over the head with

a gun or flashlight. It is the assault upon Mrs. Dean of which appellants complain. We think this no error to admit the testimony of Mrs. Dean as to all that took place when the defendant entered her room. It was from seeing him at that time that she later identified him when she saw him in the jail at Olathe, and again when she saw him in the court room at the trial. Defendant was not being tried for the assault upon Mrs. Dean. See *State v. Reuter*, 126 Kan. 565, 567, 268 Pac. 845.

11. The court erred, in connection with the witness James O. Eddings—(*a*) In allowing him to testify in detail concerning actions of Roberta Rae Carter in Birmingham and her subsequent arrest. (*b*) (1) In allowing the witness to testify to the conclusion that Roberta Carter didn't seem to want to answer his questions. (2) In stating to the jury that such conclusion was only "technically" improper and refusing a motion for mistrial because of said statement. (*c*) In allowing the witness to testify to the substance of conversations had with the Birmingham police department and the F. B. I.

James O. Eddings was a police officer, at Birmingham, serving in a patrol car. While driving along the street he saw a Buick automobile with a woman sleeping in the front seat. About four hours later he drove by and she was still there. He went to the car to talk to her and asked her several questions and she didn't seem to want to answer them. By radio he notified other officers and the F. B. I. and the car with the woman in it, who proved to be Roberta Rae Carter, was taken to the police station. When the objections were made to this officer's testimony, in ruling upon it, the court said: "The matter of the witness' conclusion as to her seeming might be technically improper. Objection is overruled." Defendant's counsel moved for a mistrial. The motion was overruled. The objections made by the defendant to the witness' testimony were primarily for the reason that defendant was not present.

Examination of the automobile tended to disclose defendant's connection with it. More than that, there was ample other evidence in the record connecting defendant with the car in Birmingham. In his conversation with the sheriff after his return to Olathe he related his traveling with Roberta Rae Carter and his separation from her in Birmingham, Ala., and admitted stealing the Buick automobile and driving it to Alabama. No hearsay testimony was given, or what the conversations were between the officers and Roberta.

We think it was not improper for the witness to testify that she was reluctant to co-operate with the officers. The witness did not testify to any conversation with the other police officers, or with the agent of the F. B. I. All he said about them was that he notified them, or asked them to come. We find no error here.

12. The court erred in allowing L. A. Billings, Jr., sheriff, over defendant's objections, to testify—(a) As an expert witness on the proposition of who could or could not have fired the bullets which made certain marks on an engine hood, the subject not being one proper for expert testimony. (b) To admission of the defendant as to being in the Leavenworth penitentiary and to committing offenses other than those charged herein.

Sheriff Billings testified that when they examined the truck at the scene of the homicide, or soon thereafter, there were three indentations on the hood of the truck and gave his judgment as to the direction from which one or more of the bullets came. Counsel for appellant urged that the witness did not qualify as an expert and considered it error to receive his testimony. Perhaps anyone, expert or not, might have a judgment with respect to the matter. The contention of appellant's counsel lacks merit. In conversations with the sheriff, appellant, after he was returned to Olathe, talked freely about where he had been, and the use of assumed names; one of which was Gene Alger. The sheriff asked how he happened to use that name and the defendant replied he got acquainted with him while in the Leavenworth penitentiary. Appellant's objection is that this disclosed the fact defendant had been in the penitentiary; a matter detrimental to him. If so, he brought it about. It was perfectly competent to show the defendant had used assumed names. The defendant also testified that he assumed the name of Foster after he had stolen the Buick car which contained a statement within the glove compartment tending to show that Foster was the owner of the car. All of this evidence was competent.

13. The court erred in denying defendant's request for permission to engage a psychologist as a part of and supplementing his psychiatric examination.

Early in the trial defendant's counsel asked permission to engage a psychiatrist to examine defendant at the county's expense. This was done in order to enable defendants to procure evidence to the effect that defendant was insane at the time of the homicide. The court delayed passing on the request for a few days to see the

trend of the trial. Later the court gave defendant leave to appoint three to be named by the defendant's counsel. They were appointed. Later defendant asked for an additional one, specifically a psychologist. The court thought three were plenty. We think there was no error in this ruling. See G. S. 1949, 62-1531; *State v. Lammers*, 171 Kan. 668, 677, 237 P. 2d 410, where it was said:

"The statutes have never required that any member of the commission be anything more than a doctor of medicine."

More than that, since counsel for defendant had the privilege of naming whom they chose, they might have named a psychologist if they thought that important.

14. The court erred in denying a request that the rule excluding witnesses be suspended for psychiatrists testifying as experts, so they could observe the conduct of the defendant.

At the beginning of the trial defendant requested that the rule be observed excluding all witnesses from the court room except the one testifying. When the trial proceeded to the stage that the doctors appointed to examine defendant were to testify defendant requested the rule be set aside. The court saw no reason for doing that for certain class of witnesses. Certainly the ruling was within the discretion of the court and we see no error in it. See *The State v. Sweet*, 101 Kan. 746, 168 Pac. 1112; *The State v. Davis*, 48 Kan. 1, 28 Pac. 1092. No point was made of this in defendant's motion for a new trial which covered in detail a long list of questions.

15. The court erred in allowing Dr. R. E. Riederer to testify to defendant's mental condition on June 23, without having stated he had an opinion as to his condition on that date.

Doctor Riederer was a member of the commission appointed on November 15, at the request of defendant, to examine the defendant and make inquiry into his sanity, his ability to comprehend his present position, and to make his defense. The commission reported on November 17, that it found defendant to be sane and able to comprehend his position and make his defense to the charges filed against him. Near the close of the trial he was called as a witness and testified to having treated the defendant while he was in jail at the request of the sheriff. He was asked:

"Assuming, now, he was in the condition on June 23rd of this year, 1952, and throughout that day and the nighttime of June 22, 1952, as when you examined him and observed the defendant here, do you have an opinion as to whether or not he would have been able to discern and know the difference between right and wrong at that time?"

The doctor answered:

"I have. On the basis of my examination of him at that time, and if at any other time he were in the same or had the same degree of comprehension he had then, he would know right from wrong."

Counsel for appellant contend this was not a proper hypothetical question. Whether proper or not, the witness did answer affirmatively. As a matter of fact, none of the doctors saw defendant on June 22nd or 23rd.

16. (a) The court erred in allowing Dr. Milton E. Anderson to testify that defendant was "criminally responsible under the law," as a conclusion that invaded the province of the jury. (b) The court erred in refusing to allow defendant to cross-examine the witness as to his opinions in the light of the findings of other qualified psychiatrists.

Doctor Anderson, superintendent and medical director of the state hospital at Osawatomie, a state hospital for the insane or mentally unbalanced people of the state, called, in rebuttal, as a witness for the state disclosed by his testimony that he was well qualified in the field of mental illness; had examined defendant with the aid of several other physicians from the institution a few days before he was called as a witness; he testified that instead of giving mental illness specific names he preferred to think of all such patients as being mentally ill, of which he testified there were many degrees; that we have many individuals who are institutionalized and many who are not who are mentally ill but nevertheless who realize the difference between right and wrong; that the degree of mental illness in some individuals is so severe that they do not realize what they are doing, or the difference between right and wrong; that in his examination of defendant he thought defendant was mentally ill. After this line of testimony, which is more extended than here set out, the county attorney asked the witness the following questions:

"And is it your opinion now that this defendant is such a person as one who may be mentally ill and yet be criminally responsible under the law laid down by the principle that if he knows the nature of his act, what he is doing, and whether or not it is right or wrong?"

Counsel for defendant objected to this question upon the grounds that it invaded the province of the jury by telling them what to do. To that the county attorney answered: "No, the question was whether he had an opinion as to whether this defendant fell in that class." Counsel for defendant reframed the question in the fol-

lowing words: "Whether he was criminally responsible?" The witness answered, "My personal opinion is that he was responsible." There was no error in this. To the extent it might be so considered counsel for defendant was really responsible.

On cross-examination counsel for defendant attempted to bolster the effect of testimony of witnesses called by defendant who had testified regarding his mental illness. The court sustained objections to the questions. We think that was proper. It was for the jury to weigh the testimony of the witnesses called by defendant in the light of all the other evidence and circumstances in the case and the weight of the testimony of those witnesses was not to be increased or diminished by Doctor Anderson's personal opinion of them.

17. The court erred (*a*) in admitting into evidence in rebuttal exhibit 52, a transcript of defendant's testimony before the court upon the issue of his claimed marriage to Roberta Carter. (*b*) In refusing to instruct the jury that exhibit 52 was to be considered by it only as bearing upon the question of defendant's sanity.

This testimony now objected to threw light on the defense being made by the defendant of insanity. Also upon his flight from the scene of the crime, the use of assumed names and other matters. We think it was not error for the court to admit this evidence in rebuttal; and that it was not error for the court to refuse to instruct that the evidence was limited to the question of defendant's sanity. See *The State v. Simmons*, 78 Kan. 852, 853, 98 Pac. 277, and authorities there cited; also authorities collected in the annotation in 5 A. L. R., 2d, 1404.

18. The court erred in refusing to allow defendant to cross-examine the witness William A. Poffinbarger, a deputy sheriff, as to his interest and prejudice.

This witness was a deputy sheriff called in rebuttal who testified to observing defendant, his manner and aptitude shortly before and after examination by the physicians as to his sanity which testimony tended to show the defendant was feigning insanity. This testimony was proper. See 16 C. J., Criminal Law, section 1081. On cross-examination witness testified he knew Willard Carver; had known him two and one-half or three years; the defendant asked the following question:

"Now, Mr. Poffinbarger, it is true, particularly among law officers, isn't it, that anyone charged with killing an officer gets pretty short shrift from the other officers?"

This question went outside the scope of cross-examination and the court properly sustained the objection. There was no error in the ruling.

19. The court erred with respect to the witness Dr. G. Wilse Robinson in refusing to allow defendant to cross examine him as to—(a) The weight the witness gave to statements made by officers of the sheriff's force as to conduct of defendant considered in determining his sanity. (b) The fact that he usually found himself opposed to other psychiatrists in this type of case and that he usually found the defendant sane.

Doctor Robinson, one of the senior medical officers of the Neurological hospital in Kansas City, Mo., and who practices neurology and psychiatry, was called as a witness in rebuttal. He had examined defendant and discussed the degrees of mental illness and in answer to hypothetical questions expressed the view that defendant knew what he was doing and the difference between right and wrong. He further expressed the view that at the time of his examination of him the defendant was consciously feigning his real condition. That, in fact, defendant did not have a serious psychosis. In the cross-examination which covers twenty-four pages of the transcript, this question was asked:

". . . would you also find and would you also assume, under the circumstances that we have here of the defendant being in the custody of the sheriff's office while awaiting trial for killing one of their fellow officers, a similar natural tendency on the part of the sheriff's officers to diminish or to gloss over any tendency, in effect, which might help the defendant?"

The objection was sustained to the question. We think it was proper. The case on trial was not one against the sheriff and other officers with respect to their tendencies. The court also sustained objection to a question as to whether the witness in examining such patients frequently found himself opposed to other psychiatrists and usually found the defendant sane. There is nothing in the record to indicate that the witness in this case, and in others, did anything more than to make a fair investigation and give his own judgment.

20. The court erred in overruling defendant's objections to the instructions to the jury as given and in not giving defendant's requested instructions 1 through 18, except 12 and 14.

Under this head counsel for appellant makes numerous criticisms of short statements in some of the instructions. We have carefully examined all of these detailed criticisms and find no substantial

merit in any of them. We have also examined the instructions given by the court and find that they fairly and competently covered the case.

21. The court erred in refusing defendant's request for the full statutory time in which to present his motion for new trial.

At the close of trial on November 29, the court gave defendant until December 5, to file a motion for new trial and set the date for hearing the motion on December 20. We think that was a matter within the sound discretion of the trial court and we find nothing in the record to indicate that defendant was prejudiced in any particular by reason thereof. A lengthy motion for a new trial was filed and the argument of counsel in support of it covers sixty-three pages of the transcript.

Counsel's specifications of error, Nos. 22 to 26, were not specifically argued. Counsel state that what happened in each situation is made clear by the assignment itself. We have examined each of these assignments and find that none of them is of sufficient consequence to require specific treatment. We find no error in any of them. The twenty-seventh assignment of error is that the court overruled the motion for new trial. As to this counsel refer to the argument made on other points.

The questions which counsel for appellant presented for our consideration, having all been reviewed and none of them found to have substantial merit, demonstrate the industry, earnestness and zeal of such attorneys to be of service to the appellant. It is possible by presenting these questions counsel for appellant sought to develop the view that appellant did not have a fair trial. If so, we find no justification for it in the record. We have carefully examined the abstract of record of 340 pages, the transcript with testimony of more than 1,500 pages and many of the exhibits and find that notwithstanding many objections and interruptions the court never lost its judicial attitude; that time was taken when requested for any proper purpose, and apparently every effort was made, both by the county attorney and the court, to give defendant a full hearing and a fair trial.

We realize the case was difficult to defend. Aside from the fact that the court entered a plea of not guilty for defendant when he stood mute on his arraignment, there is not a contention, or even a hint, anywhere in this record that defendant did not commit the crimes charged against him in the information.

The only defense counsel for appellant sought to make was that of insanity. On this point we shall not attempt to summarize the voluminous evidence. It is sufficient to say that it was ample, really overwhelming, to justify the jury in concluding that defendant knew what he was doing and knew right from wrong, not only at the time of the trial but at the time the offenses charged were committed. We find no error in the record. Judgment of the trial court is affirmed.