Nathan Earl JONES, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4604.

Supreme Court of Wyoming.

July 26, 1977.

Gerald K. Russell, Rawlins, signed the brief and appeared in oral argument on behalf of appellant.

V. Frank Mendicino, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., and Frank R. Chapman, Asst. Atty. Gen., Cheyenne, signed the brief and appeared in oral argument on behalf of appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

Appellant-defendant was found guilty by a jury in district court of first degree murder in killing a human being during an attempt to perpetrate a robbery in violation of § 6–54, W.S.1957, as amended,[1] and sen-

---

1. Section 6–54, W.S.1957, was amended by S.L. 1973, Ch. 136, § 1, and as far as pertinent to this case reads as follows:

"Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree.

 * * * * * *

"(e) Upon conviction of murder in the first degree, if the offense does not involve a course of conduct as described in subsection (b) of this section, the person convicted shall be sentenced to imprisonment for life."

Section 6–54(b), which provided for the death penalty in cases involving certain enumerated courses of conduct, was held to be unconstitutional and severable from the rest of the statute in *Kennedy v. State,* Wyo.1977, 559 P.2d 1014. Since no course of conduct as described in

tenced for the term of life in the Wyoming State Penitentiary. In this appeal, the defendant raises the following issues:

1. Was the circumstantial evidence adduced at trial sufficient to sustain his conviction?

2. Did the prosecution engage in massive suppression of exculpatory evidence?

3. Did the trial court err in denying defendant's motion for a new trial based upon newly discovered evidence?

We shall affirm.

On July 30, 1974, William Johnson, the operator of an automobile service station, was found shot to death by two different guns, one a .22 caliber weapon and the other a .38 caliber weapon. The shots caused three wounds, the one in the left chest proving mortal. After investigation, the defendant and two others, Paula Jean Cason and Gary Richmond, were arrested on the same day. Cason was found at 4:00 p. m. in Richmond's car, which was parked perpendicular to old U.S. Highway 30 about a mile east of the service station toward Sinclair, Wyoming. Richmond was arrested a few minutes later in Sinclair. The defendant was apprehended sometime after 5:00 that evening. In a separate trial, Richmond was convicted of killing a human being during an attempt to perpetrate a robbery; affirmed, *Richmond v. State*, Wyo.1976, 554 P.2d 1217.

The scene of the crime was a service station located just off old Highway 30, three miles east of Rawlins and three miles west of Sinclair. There are no other buildings in the area except for a drive-in theater which is located about a mile to the west. The Union Pacific Railroad tracks are located approximately 150 yards south of the station. Interstate Highway 80 is located about one-half mile to the north.

The defendant was seen sitting in the front seat of Richmond's car with the latter and his girlfriend, Paula Cason, at about 10:00 a. m. on the day of Johnson's murder. The car was parked near Cason's residence at the Pioneer Apartments in Rawlins. Richmond and the defendant returned at 2:00 p. m. to pick up Mrs. Cason, who left her apartment with a packed suitcase, apparently intent on going to Houston, Texas. While she did not possess the funds necessary to make the trip, Cason was relying on Richmond and defendant to get her the money through the robbery. Cason got into the front seat of Richmond's automobile and occupied a position between the driver, Richmond, and the defendant. The defendant, a black man, was wearing a maroon-colored short-sleeved knit shirt, jeans and a necklace.

The first stop was at a Gas-O-Mat in Rawlins where the defendant purchased a pack of cigarettes. They proceeded to old Highway 30 and went past the service station to the outskirts of Sinclair where Richmond was seen walking around his car while Cason and the defendant remained in the interior. They apparently doubled back and passed the station again while heading west toward Rawlins. Richmond stopped the car in the vicinity of the drive-in and asked Cason to drive. Richmond got out of the car and occupied the seat previously used by the defendant while the latter moved to the back seat. As the defendant was leaving the car, Cason noticed a brown holster strapped on his left hip, which was holding a black-barreled gun with a brown handle. Cason, following Richmond's instructions, maneuvered the car east toward the service station until she stopped it west of the building and let the defendant and Richmond out of the car. She last saw them run across the highway and start walking toward the service station. As directed, Cason drove into the service station and had the attendant check the oil and water. She then proceeded about a mile down the highway toward Sinclair whereupon she parked the car out of view of the service station.

subsection (b) is involved in this case, the validity of the mandatory life sentence imposed on the defendant is not affected by that holding. Subsequent to the *Kennedy* decision, the

Wyoming State Legislature repealed § 6–54, W.S.1957, as amended, and created a new first degree murder statute. See S.L.1977, Ch. 122, §§ 1, 2.

Four section men of the Union Pacific Railroad were spotting ties on the railroad tracks in the vicinity of the service station. The crew was working about 1,000 yards east of the station at about 3:00 p. m. when two of them heard three gun shots fired in rapid succession, lasting about three to five seconds. Within two to three minutes thereafter, all members of the crew saw two men running in an easterly direction from the service station. One of the men was described as a black male about six feet tall, 145–160 pounds, and wearing a wine-colored shirt. The other man was a white male with a beard and shoulder-length hair and wearing an orange shirt. They went through a fence north of the highway and disappeared momentarily behind a large brush-covered mound of dirt about 400 to 500 feet east of the station. A few minutes later, they reappeared from the brush area and split up, the black man running north toward Interstate Highway 80, the white man heading east. As the black man was moving away from the brushy area, one of the workers noticed an object fly into the air in the vicinity of the path taken by the former. The black man disappeared over a cut or bank to the highway about one-half mile away.

Robert Treick was commuting from his home in Rawlins to his job in Hanna on the afternoon of the murder. He had left the house at about 2:50 p. m., filled his pickup with gas and entered Interstate 80 heading east. About halfway between Rawlins and Sinclair, he picked up a hitchhiker whom he described as a black man wearing a wine or purple-colored tank top shirt, Levi's and necklace. The hitchhiker was perspiring heavily and spitting out the window. At the black man's request, Treick drove him into the outskirts of Sinclair, whereupon he got out and took off running. Treick identified the hitchhiker as the defendant.

Ron Davis was driving in Sinclair on the way to Rawlins when he was waved down by the defendant sometime between 3:30 p. m. and 4:00 p. m. The defendant was swea-

ty and quite subdued. At defendant's request, Davis drove to Rawlins and dropped him off at his residence.

Richmond, subsequent to his arrest, made a tape-recorded statement to the Carbon County undersheriff, Floyd Rodabaugh. The statement was made at about 5:15 p. m. Thereafter Rodabaugh, accompanied by the manager, went out to the service station to collect evidence. He found a white T-shirt with a string tied around the center to form a hood and a black electrical cord near the floor safe a few feet away from the place where Johnson's body was found. He later searched an area about a block west of the station and on the north side of Highway 30, whereupon he observed two sets of footprints which headed in a northerly direction toward the station. The tracks led to the back or west side of the building and proceeded around to the north end where they then disappeared into a packed patch of ground about 20 to 25 feet from the entrance to the office (on the east side of the building).

At about 6:00 p. m., sheriff Ogburn and deputies Tierney and Glidden were accompanied by two of the railroad section men to the general area where the two fleeing men were seen hiding behind a brush-covered sand dune. Tierney observed two sets of tracks which led to a large sand dune about 50 feet to the east. Tierney started digging a disturbed area of ground in the brush wherein he found a .22 caliber revolver, a green ski mask with holes for eyes and mouth, a brown jersey glove with red lining and a gray leather glove. A few feet away Glidden found a .38 caliber revolver. After Tierney recovered the evidence, he followed two sets of tracks east of the brush-covered area until they split up, whereupon he traced the tracks which headed in a northerly direction toward Interstate 80. After walking about 100 feet, Tierney encountered a small wash where he found a brown-leather holster which he described as fitting a short-barreled revolver.[2] Tierney

---

2. On cross-examination, Tierney was asked which of the recovered weapons would fit in the holster. The colloquy appears as follows:

"Q Your testimony, being somewhat familiar with firearms, was that this holster wouldn't fit this .22, would it?

then continued to follow the tracks which ultimately led to the interstate highway.[3]

The .38 caliber bullet removed from victim's body was ballistically matched to the .38 caliber revolver retrieved from the brush-covered sand dune. The two .22 caliber bullets taken from the victim's body could not be matched with any weapon because they were mutilated.[4]

## INSUFFICIENCY OF EVIDENCE

■ The defendant contends that inasmuch as his conviction was based upon circumstantial evidence, a different standard should be applied by this court in determining whether such evidence was sufficient to sustain his conviction. He emphasizes the lack of direct proof of his knowledge of either a plan to commit the robbery or its attempted commission and the failure of the prosecution to place him inside the service station which in his view is insufficient to support the guilty verdict because the evidence does not exclude every reasonable

hypothesis other than that of guilt.[5] We will state once again that the standard of review which this court must follow in these cases is set forth in *Blakely v. State,* Wyo.1975, 542 P.2d 857, 863:

"An instruction explaining circumstantial evidence is for jury consumption. It does not in anywise change the standard of review in a criminal case by this court which remains as stated in *Harris v. State,* Wyo.1971, 487 P.2d 800, 801. This court will 'view the evidence in a light most favorable to the prosecution and determine questions of law as to whether there is substantial evidence, direct or circumstantial, or both, which, with the reasonable inferences that may be drawn therefrom, will sustain the verdict.' "

See also, *Johnson v. State,* Wyo.1977, 562 P.2d 1294, 1297, and *Bentley v. State,* Wyo. 1972, 502 P.2d 203, 208. If we were to adopt the defendant's view of the evidence, this court would not only be in the position of denying the jury's right to draw infer-

"A I didn't say it wouldn't.
"Q No, I'm just putting it in the record.
"A I testified that it was for a short barreled revolver, sir.
"Q More like the .38?
"A Yes, more like the .38, sir."

3. Deputy Tierney testified that the tracks led to a bank which dropped off to the highway. He then noticed a disturbed area where a person had slipped down the bank. At the bottom, he found a set of tracks which he described as made by the same type of shoe as the set on top of the bank.

4. Dr. James Booker, Director of the Wyoming State Crime Laboratory, conducted the ballistics tests. He was queried whether the .22 caliber single-action revolver recovered in the brush area provided a reason why he could not determine the weapon from which the two .22 bullets were fired. His response was:
"The weapon is mis-aligned [sic]. The cylinder had an angular mis-alignment [sic]. Bullets fired from this weapon strike the barrel at an angle. They don't pick up good rifling marks. They are badly damaged before they even leave the weapon. It is very hard to make a comparison in this case. Comparing test against test was really very pointless because I wasn't getting a good test. Then also, in this case, with the items that have been—the two fired bullets were badly damaged, and if they had come from this weapon

or another weapon, it was leaving very bad marks on them. So, there is no point in continuing."

5. This rule was followed in *Mulligan v. State,* Wyo.1973, 513 P.2d 180, and cases there cited, and was concerned with the effect of circumstantial evidence and the instructions which should be delivered to the jury. The *Mulligan* rule was expressly overruled in *Blakely v. State,* infra, wherein we adopted the concept that circumstantial evidence should be evaluated by the jury on the same basis as direct evidence. It is appropriate to note that the jury in the case at bar was given an instruction regarding circumstantial evidence which is consistent with *Mulligan v. State,* supra. Instruction No. 6 reads as follows:
"In order to convict on circumstantial evidence it is necessary not only that the circumstances all concur to show that the Defendant committed the crime, but that they all be inconsistent with any other rational conclusion. The evidence must lead to the conclusion so clearly and strongly, where the evidence is purely circumstantial, as to exclude every reasonable hypothesis consistent with innocence."
In retrospect, the instruction was more than the defendant was entitled to. However, we are not critical of the trial court in using this instruction since the trial occurred prior to the *Blakely* opinion.

ences from the facts, but would also be weighing the conflicts in the evidence and considering the credibility of the witnesses. This would be an improper exercise of appellate review and a usurpation of the function and authority of the jury. *Janski v. State,* Wyo.1975, 538 P.2d 271, 277; *Fresquez v. State,* Wyo.1971, 492 P.2d 197, 202; *Brown v. State,* 1959, 80 Wyo. 12, 336 P.2d 794, 797. We decline the defendant's invitation to do so.

■ The defendant in this case was convicted of first degree felony-murder, and the underlying felony was attempted robbery. Section 6–54, appearing in footnote 1, is the statute formulating the crime of felony-murder. While the statute is worded in the alternative,[6] our concern is with only one of the circumstances expressed therein: If a homicide is perpetrated during the course of an attempted robbery, the robber is guilty of murder in the first degree.[7] The basic offense is the attempted robbery and not the death which occurred during its commission. Thus, the necessary intent to convict a person of felony-murder, under such a circumstance, must be associated with the attempted robbery, not the homicide whose necessary elements are implied by the statute. *Richmond v. State,* supra. The defendant's challenge is apparently aimed at the failure to directly show the requisite intent on his part to commit the robbery.[8]

■ Motive has been defined as "[a]n inducement, or that which leads or tempts the mind to indulge a criminal act." Black's Law Dictionary, 4th Ed. 1976, p. 1164; *Buckles v. State,* Wyo.1972, 500 P.2d 518, 523, cert. den. 409 U.S. 1026, 93 S.Ct. 475, 34 L.Ed.2d 320. While motive is not an element of a crime, and proof of it is not essential to sustain a conviction, it does have great probative force in determining guilt, especially in cases which depend on circumstantial evidence. *State v. Knox,* 1945, 236 Iowa 499, 18 N.W.2d 716, 724; *State v. Taylor,* 1947, 356 Mo. 1216, 205 S.W.2d 734, 737; *Simmons v. State,* 1924, 111 Neb. 644, 197 N.W. 398, 402, cert. den. *Simmons v. Fenton,* 268 U.S. 696, 45 S.Ct. 514, 69 L.Ed. 1162; *People v. Lewis,* 1937, 275 N.Y. 33, 9 N.E.2d 765, 768–769; 22 C.J.S. Criminal Law § 31(1), pp. 107–110; 21 Am.Jur.2d (Criminal Law) § 85, pp. 166–167. There is evidence that acquisition of money to finance Paula Cason's intended trip to Houston, Texas, supplied the motive for the attempted robbery. Mrs. Cason testified that while she did not have the funds to make the trip, her boyfriend, Richmond, promised her that he would get her the money. The defendant's knowledge of Mrs. Cason's desire to leave town is shown by the testimony of a witness who, while engaged in a conversation with the defendant in the morning of the day of the crime, heard her inducement to the defendant with regard to taking her to Texas.[9]

**6.** This section provides for three sets of circumstances under which a person may be properly convicted of the crime of murder in the first degree: First, if he commits the acts purposely and with premeditated malice; second, if he commits the act in the perpetration of certain specified other crimes; and third, if he commits the act in attempt to perpetrate these specified crimes. *State v. Lindsay,* 1957, 77 Wyo. 410, 317 P.2d 506, 510, and *Richmond v. State,* supra, 554 P.2d at 1230, n. 13.

**7.** Section 6–54, as paraphrased in the alternative appropriate to this case provides: "Whoever * * * in the * * * attempt to perpetrate any * * * robbery, * * * kills any human being, is guilty of murder in the first degree".

**8.** The defendant does not raise any question of whether there was sufficient evidence to show

that an attempted robbery did in fact occur. A summary of this evidence, therefore, is unnecessary.

**9.** Ron Davis, one of the witnesses who saw the defendant in the presence of Richmond and Cason in the parking lot of the Pioneer Apartments, testified regarding a conversation with the defendant. His pertinent testimony with regard thereto is as follows:

"Q Did you have any conversation with Defendant now at the time testified to?

"A Yes.

"Q All right. I want you to specifically tell the Court and Jury what the conversation was that you had with him at that time.

* * * * * *

"A He said he was trying to get into this chick's pants.

"Q Did he say anything else with reference to what he would indicate by that? Was

■ The record does disclose that no direct evidence of intent was introduced at trial. The rule is well-settled, however, that intent to commit a specific crime is not required to be proven by direct evidence but may be shown by circumstantial evidence. *People v. Perry,* 1961, 23 Ill.2d 147, 177 N.E.2d 323, 327, cert. den. *Perry v. State of Illinois,* 369 U.S. 868, 82 S.Ct. 1035, 8 L.Ed.2d 86; *Sinks v. State,* 1956, 235 Ind. 484, 133 N.E.2d 563, 564; *People v. Martin,* 1938, 12 Cal.2d 466, 85 P.2d 880, 884. The mind of an alleged offender may be read from his acts, his conduct, his words and the reasonable inferences which may be drawn from the circumstances of the case. *Garcia v. People,* 1970, 172 Colo. 329, 473 P.2d 169, 170; *State v. Stuart,* 1970, 51 Haw. 656, 466 P.2d 444, 445; *State v. Gatewood,* 1950, 169 Kan. 679, 221 P.2d 392, 396. To otherwise require proof of specific intent by direct evidence " * * * would make it impossible to convict in any case where there was not a culmination of the intent." *Garcia v. People,* supra, 473 P.2d at 170.

■ In the case now before us, there are several links in the chain of evidence, which bonded together, show not only the existence of the defendant's guilty state of mind, but his role as a willing participant in the attempted robbery. This evidence includes the following: That the defendant, a frequent consort of Richmond, was seen twice in the presence of Richmond and Cason on the day of the crime; a motive existed for the robbery attempt; the three confederates reconnoitered the service station prior to the robbery attempt; the defendant and Richmond were let out of the car in the immediate vicinity of the scene of the crime; the defendant was carrying a pistol in a brown-leather holster when he got out of the car; a black man, described to be of the defendant's height and build and wearing a wine-colored shirt (similar to that worn by the defendant both before and after the crime) was seen fleeing from service station within minutes after gun shots were heard; [10] two guns, a mask and two gloves were found in a brushy area in which the fleeing men momentarily disappeared; a brown-leather holster was found in the path of the black man, who headed in a northerly direction toward Interstate 80; that the defendant was identified as the hitchhiker picked up on Interstate 80 near the place and time of the crime and taken into Sinclair; and the defendant was picked up in Sinclair and taken to Rawlins approximately 30 to 45 minutes after the attempted robbery and murder.

■ It is suggested that evidence of opportunity alone to commit the crime does not satisfy the prosecution's burden of proof that an accused actually committed the act. *State v. Morris,* 1929, 41 Wyo. 128, 283 P. 406, 414. It is also true, however, that evidence of opportunity to commit the act is a link, which considered in connection with other incriminating facts, may prove circumstantially that an accused did commit the alleged crime. *State v. Randecker,* 1971, 79 Wash.2d 512, 487 P.2d 1295, 1301; *State v. Jackson,* 1966, 101 Ariz. 399, 420 P.2d 270, 272; 29 Am.Jur.2d (Evidence) § 251, pp. 299–302.

■ A consideration of the record in its entirety supports the conclusion that the defendant and Richmond were engaged in a *joint endeavor to rob the service station.*

---

there any movement of his face or anything at that time that Nathan said that he did with reference to his head or anything, any motion or movement?

"A Well, he said that and smiled.

"Q All right. Any other conversation that you heard?

"A Paula [Cason] said that if he would take her to Texas that she would let him get in her pants."

**10.** The fact of flight by a person after the commission of a crime is admissible as evidence which may be considered along with other circumstances in the case as tending to show a consciousness of guilt. *State v. Sorensen,* 1969, 104 Ariz. 503, 455 P.2d 981, 987; *Jones v. State,* 1966, 242 Md. 323, 219 A.2d 77, 79; *State v. Martin,* 1953, 175 Kan. 373, 265 P.2d 297, 308; *People v. Gregoris,* 1945, 70 Cal. App.2d 716, 161 P.2d 568, 570. Professor Wigmore has likened flight from justice and its analogous conduct to the old proverb which says " 'the wicked flee, even when no man pursueth; but the righteous are bold as a lion.' " II Wigmore, Evidence, 3rd ed. 1940, § 276(4), pp. 111–119.

While the defendant claims that there is no direct evidence which places him inside the building where the robbery attempt and murder took place, there is evidence from which an inference can be drawn that two persons were indeed inside of the building. In any event, it was not essential to the State's case that the defendant actually be placed inside of the building or that the defendant fired the fatal shot. The jury was instructed that as an aider and abettor, an accomplice is charged as a principal. Section 6-14, W.S.1957. If two or more persons are jointly engaged in the perpetration of or an attempt to perpetrate a robbery, and a human being is killed during its commission by any one of the persons so jointly engaged, then each of the offenders are equally guilty of the homicide. *Richmond v. State,* supra, 554 P.2d at 1233.

We conclude from a consideration of the record that the evidence was more than sufficient to sustain the defendant's conviction of first degree felony-murder.

## SUPPRESSION OF EVIDENCE

The defendant claims the State engaged in massive suppression of exculpatory evidence which deprived him of due process as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and § 6, Article I, of the Wyoming Constitution. A catalog of evidence alleged to have been suppressed at the defendant's trial reveals the following items:

1. Photographs and negatives of the body and the interior of the service station;
2. One .22 caliber revolver;
3. One .22 caliber rifle;
4. A money clip containing $145.00 in bills which had a pencil-sized bullet hole through it;
5. A cassette tape of a pretrial statement given by a State's witness;
6. Notes of the deputy county coroner;
7. Automobile owned by Richmond and used in the perpetration of the crime;
8. Interior of service station which was remodeled.

The rule governing circumstances, when the withholding or suppression of evidence by the prosecution constitutes a sufficient ground for overturning a defendant's conviction,[11] is stated in *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, where it was held:

"* * * [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218.

The duty of disclosure is not designed to penalize society for conduct of its law enforcement officers which encroaches upon an accused's constitutional rights but is mandated by the accused's fundamental right to a fair trial. *Evans v. Janing,* 8 Cir. 1973, 489 F.2d 470; *United States v. Hibler,* 9 Cir. 1972, 463 F.2d 455; *Levin v. Katzenbach,* 1965, 124 U.S.App.D.C. 158, 363 F.2d 287, on remand D.C., 262 F.Supp. 951; *United States v. Consolidated Laundries Corporation,* 2 Cir. 1961, 291 F.2d 563. This duty is also consistent with the obligation of the attorney for the sovereign "whose interest * * * in a criminal prosecution is not that it shall win a case, but that justice shall be done." He is a servant of the law whose twofold aim is to see that "guilt shall not escape or innocence suffer." *Berger v. United States,* 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314. See also, American Bar Association Project on Standards for Criminal Justice, Prosecution Function and the Defense Function, § 3.11(a).[12] The duty of disclosure, however, has its limitations.

---

11. For an exhaustive coverage of the subject, see Annotation "Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction," 34 A.L.R.3d 16.

12. DR 7-103(B), Code of Professional Responsibility, provides in pertinent part:

"A public prosecutor * * * shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the

■ A three-pronged test that must be applied in nondisclosure cases to determine whether a violation of due process has occurred under the rule of *Brady v. Maryland* was succinctly set forth in *Moore v. Illinois*, 1972, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706, reh. den., 409 U.S. 897, 93 S.Ct. 87, 34 L.Ed.2d 155, wherein it was said:

"The heart of the holding in Brady is the prosecution's suppression of .evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. * * * " 408 U.S. at 794–795,[13] 92 S.Ct. at 2568, 33 L.Ed.2d at 713.

The *Brady* rule has been discussed by the Supreme Court in the context of a specific request by defense counsel for information without holding that a failure to make such a request is a waiver of the prosecutor's obligation to provide an accused with exculpatory evidence. See e.g., *Moore v. Illinois*, supra. This language, however, has engendered a significant amount of confusion, and while the courts have generally interpreted the *Brady* rule as covering suppression of unrequested evidence,[14] there remained the problem of whether the lack of a request required a higher standard of materiality which must be met before nondisclosure could be held to constitute a deprivation of due process. *United States v. Keogh*, 2 Cir. 1968, 391 F.2d 138, 147–148; *Evans v. Janing*, supra, 489 F.2d at 475.

An attempt to resolve these problems was forthcoming in *United States v. Agurs*, 1976, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d

342. The Supreme Court opinion discussed the application of the *Brady* rule to three distinct categories of cases and concluded that the prosecutor's obligation to disclose evidence in his possession that would be material to the defense varied depending upon the situation. The analytic categories involved the following factual circumstances: (a) prosecutorial tolerance of perjured testimony; (b) prosecutorial suppression after a specific request by the defense for exculpatory evidence; and (c) no request, or only a general one, by the defense for exculpatory evidence.

The first category finds its genesis in *Mooney v. Holohan*, 1935, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406, reh. den. *Ex parte Mooney*, 294 U.S. 732, 55 S.Ct. 511, 79 L.Ed. 1261, which held that deliberate deception of court and jury by the presentation of known false testimony is "inconsistent with the rudimentary demands of justice". 294 U.S. at 112, 55 S.Ct. at 342, 79 L.Ed. at 794. Subsequent cases have held that known use of perjured testimony (even if unsolicited) is fundamentally unfair, and the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Giglio v. United States*, 1972, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104; *Napue v. People of the State of Illinois*, 1959, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217. A strict standard of materiality has been employed in these cases because the truth-seeking function of the trial has been corrupted, and prosecutorial misconduct was present.

The second category is characterized by *Brady v. Maryland*, supra, wherein the defense had made a pretrial request for specific evidence. The Supreme Court said

prosecutor * * * that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."

13. It is clear from a reading of the *Brady* rule that the United States Constitution does not require the prosecutor to allow complete discovery of an accused's files as a matter of routine practice. *United States v. Agurs*, infra. It was noted in *Moore v. Illinois*, supra, that there is "no constitutional requirement that the

prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." 408 U.S. at 795, 92 S.Ct. at 2568. There must first be a finding of materiality before disclosure under *Brady* is compelled. This test is the significant limitation which is placed on the duty of disclosure.

14. See generally, Annotation, 34 A.L.R.3d 16, p. 91.

that the requirement of materiality under *Brady* is rationalized by a concern that the suppressed evidence might have affected the outcome of the trial. The Court explained the standard of materiality in terms of the function served by a specific defense request:

> "* * * Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs, supra*, 427 U.S. at 106, 96 S.Ct. at 2399, 49 L.Ed.2d at 351.

The third category embraces those cases wherein no request is made or the request is for "*Brady* material" or "for anything exculpatory." [15] The Supreme Court prescribed a more stringent standard for this category before a violation can be established:

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. * * * *[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of question-

able validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." (Emphasis added.) 427 U.S. at 112–113, 96 S.Ct. 2401, 49 L.Ed.2d 354.

Our review of the record discloses that other than a request for the photographs, there were no pretrial requests by defense counsel for specific exculpatory material or any general requests for "*Brady* material." The defendant did file a request for a bill of particulars requesting the names of all prosecuting witnesses and the substance of their testimony, and a separate motion to suppress any electronic surveillance information in the possession of the State. The defendant also indicated on a "Pretrial Conference Form" that he had not obtained full discovery from the State. The State replied that it had disclosed to defense counsel any "*Brady* material" of which it had knowledge.

 In the appendix of the defendant's brief appears the affidavit of trial counsel for the defendant, stating that a pretrial conference was held before the trial judge wherein it was orally stipulated between defense counsel and the prosecuting attorney that all evidence and exhibits with regard to the case would be given to the defendant upon being obtained by the State, that no pretrial conference order was entered because the trial judge wanted briefs submitted on the defendant's motion relative to alleged suppression of evidence by the prosecution, and that the motion was later withdrawn because defense counsel did not know of the extent of the alleged suppression. The affidavit is an improper attempt to correct the record.[16] Even so, it

---

**15.** The Supreme Court concluded that there was no significant difference between cases in which there has been a general request for exculpatory evidence and cases in which no request has been made. The Court opined that a general request

> "* * * really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evi-

dence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. * * * *"* *United States v. Agurs, supra*, 427 U.S. at 106–107, 96 S.Ct. at 2399, 49 L.Ed.2d at 351.

**16.** The proper method to correct the record is prescribed by Rule 75(d), W.R.C.P.:

> "If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be sub-

discloses no more than a sweeping request. We can only deduce that, with the exception of the photographs, only a general request for other "*Brady* material" was made.

█ Since only the photographs were specifically requested by defense counsel prior to trial, the standard of materiality with regard thereto will be judged by the *Agurs* specific-request standard. Each of the other nonimpeachment items of evidence under scrutiny are governed by the third and stricter standard of materiality articulated in *Agurs*. In other words, the undisclosed evidence must create a reasonable doubt about the defendant's guilt which did not otherwise exist. It must not be forgotten that a precondition to a consideration under both tests is the requirement that the undisclosed evidence have a favorable character to the defendant. *Moore v. Illinois,* supra.

█ Before examining the significance of each of the undisclosed items of evidence, it is necessary to emphasize that this case does not involve the common factual circumstance wherein discovery of potentially exculpatory information occurs after the trial of the case. The fact that each item of evidence under scrutiny was missing was known to the jury. While it is not our function to speculate as to what effect this information had on the jury's decision, it was, nevertheless, a factor not prevalent in most non-disclosure cases.

The defendant claims that the State suppressed 43 photographs and 47 negatives which allegedly included pictures of the body of the victim, the interior of the service station and the footprints in the brush area east of the building. The defendant's arithmetic is apparently derived from testimony which showed that on July 31, 1974, the Carbon County sheriff's office took four rolls of film, each containing 20 exposures, to a drug store to be forwarded to a film service for processing. Twenty prints out of the 80 processed could not be developed, and 17 prints, together with 13 negatives, were produced for use at the trial. The defendant contends that the balance of 43 prints and 47 negatives was not produced by either the sheriff's office or the prosecution.

The record discloses that undersheriff Rodabaugh took between four and five pictures of the victim's body before he turned the investigation of the scene of the crime over to deputy Bashford. Bashford used up about one and a half rolls of film (or 30 pictures) in photographing the body, the interior of the building and the footprints near the large brush-covered sand-dune area into which the fleeing murderers momentarily disappeared. Rodabaugh testified that the remainder of the four rolls of film included pictures taken in connection with other investigations. Thus, the record shows that about 35 photographs were taken in connection with the Johnson murder, and 17 of these photographs were produced at the defendant's request and eventually introduced at trial. It is reasonable to infer that some of the undisclosed prints were included in the number which could not be developed.

The photographs introduced at trial included pictures of footprints and the interior of the building. Apparently, only the pictures of the victim's body were not produced. The record, however, reveals substantial testimony of several witnesses with regard to the description and identity of the victim, the nature and entry of the bullet wounds and the position of the body relative to the interior of the building. Even if these photographs were inadvertently suppressed, the defendant has failed to show their favorable character to his defense, and, if so, that a substantial basis for claim-

mitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court, either before or after the record is transmitted to the supreme court, or the supreme court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the supreme court."

ing their materiality existed with regard to either guilt or innocence.

The manager of the service station testified that on July 30, 1974, he saw a .22 caliber rifle in the bedroom of the victim's living quarters (located in the same building) and a .22 caliber revolver in the top drawer in a desk which was a few feet away from the body which was positioned in the doorway between the office and storage room. Both guns were owned by the victim. When the station manager asked two of the investigating officers that evening whether they needed the .22 revolver, they responded that it was not needed.

The defendant contends that inasmuch as two of the bullets taken from the victim's body, one of which was fatal, were .22 caliber, which could not be ballistically matched up to any weapon, the existence of the two additional .22 caliber weapons inside of the building was material to the question of guilt or innocence. The circumstances surrounding failure on the part of the sheriff's office to preserve at least the handgun does not comport with sound investigative practices, and its nondisclosure is certainly favorable to the defense.[17] This undisclosed evidence, however, does not create a reasonable doubt about the defendant's guilt which did not otherwise exist, and, thus, is not material to the question of his guilt or innocence.

While the two .22 caliber bullets removed from the body were mutilated, it must be remembered that they could never be identified as to the type of gun from which they were fired regardless of the number of

guns identified or introduced into evidence. It should also be noted that the .22 caliber weapon, found buried in the brush-covered sand dune, was described by the expert witness as having an angular misalignment in the cylinder which damaged any bullet discharged therefrom. Whatever favorable inference may have been drawn from the introduction of this particular weapon was counterbalanced by the jury's knowledge of the existence of the other two .22 caliber weapons, and the fact that four of the seven fired .22 caliber cartridge cases submitted to ballistics test were not matched to the weapon received into evidence. The record further shows that the defense relied on these facts in his cross-examination and closing argument. The defendant had the full benefit of any cloud cast by the presence of other weapons at the murder site.

The .38 caliber weapon found buried a few feet away from the .22 revolver was ballistically matched up with the .38 caliber bullet removed from the victim's head. The existence of this fact is critical to the defendant's argument, inasmuch as he was seen carrying a gun inside of a brown-leather holster immediately prior to the commission of the crime. The brown-leather holster found in the path of the fleeing black man was described as designed for a small-barreled gun, similar to a .38. The introduction of the additional .22 weapons does not rebut the evidence that the .38 revolver was used in connection with the crime and that a .22 was found a few feet away from the discarded .38. The inference to be drawn is obvious.

---

17. A number of jurisdictions have held that where evidence is suppressed by the police or other law enforcement officials of the jurisdiction trying the case, rather than by the prosecutor, a conviction may be overturned provided the requirements of constitutional error are met, notwithstanding the lack of knowledge on the part of the prosecutor. Some courts require knowledge on the part of the prosecutor and the defendant before police suppression can be considered as a ground for setting aside a conviction. See generally, Annotation, 34 A.L.R.3d 16, p. 74. The leading case in the area is *Barbee v. Warden, Maryland Penitentiary,* infra. As stated by the court, the rationale for the rule is:

" * * * [I]t makes no difference if the withholding is by [law enforcement] officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. * * * " 331 F.2d at 846.

We have already evaluated the evidence adduced at trial and have concluded that it was sufficient to support the jury's finding of guilt beyond a reasonable doubt. The fact of presence in the building of two .22 caliber weapons other than the one used in the murder does not alter this finding, especially in light of the fact that the jury did know of their nondisclosure. This is not a case where the verdict has only slight support wherein "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs,* supra, 427 U.S. at 113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355.

The case of *Barbee v. Warden, Maryland Penitentiary,* 4 Cir. 1974, 331 F.2d 842, is not applicable to the facts of this case. In that case, the petitioner's revolver was produced in open court, formally marked for identification and witnesses interrogated with regard thereto. The prosecutor, however, did not produce the ballistics report which indicated that the gun was not used in the shooting of a police officer. The Fourth Circuit Court of Appeals said that presentation of the gun in this manner

" * * * could not fail to suggest an inference that this was the weapon used to commit the offense for which Barbee was on trial. * * * Once produced, it became not only appropriate but imperative that any additional evidence concerning the gun be made available to substantiate or to refute the suggested inference. * * * We cannot say that the trier of fact would have given no weight to the ballistics report or the expert's testimony. * * * " 331 F.2d at 845.

■ Undersheriff Rodabaugh and deputy Glidden discovered currency folded in a money clip which was lying on the floor near the victim's body. This item of evidence was removed by the deputy county coroner when he picked up the body. The money and clip were collected by the station manager's wife on the following day while she was at the mortuary. She testified that she received $145.00 in bills through which was a hole about the size of a pencil head. The money was deposited in the service station bank account, and the money clip was returned to the station. The defendant contends that the nonproduction of this evidence negates the finding of a robbery attempt and is thus material to the question of punishment, viz, the existence of money near the victim's body could suggest to the jury that no robbery was attempted, and hence, no felony-murder was committed.

Once again, these facts were known to the jury and had to be considered in their deliberations on the question of whether there was an attempted robbery. The defendant's argument also ignores the existence of other evidence in the record which strongly suggests that the defendant and Richmond attempted to rob the station. The victim customarily kept currency folded in a clip in his right-hand shirt pocket. The shirt pocket had been torn, and, the money was found lying beside the victim's body. It is not unreasonable to suggest that if the money had a bullet hole through it, the perpetrator of the holdup would not want to risk having such incriminating evidence in his possession. The nonproduction of this evidence, when considered with other evidence of a robbery attempt, does not create a reasonable doubt that did not otherwise exist with regard to the defendant's participation in the attempted holdup.

■ The defendant also claims that suppression occurred in connection with the sale of Richmond's automobile and the remodeling of the interior of the service station. Neither in his brief to this court nor in oral argument did he address himself to the alleged errors in connection with this evidence. We will not consider these matters on appeal. *Salaz v. State,* Wyo.1977, 561 P.2d 238; *Buckles v. State,* supra. If in fact such errors do exist, they are not fundamental, requiring reversal.

■ It is the defendant's next contention that two items of the evidence under scrutiny could have been used in the cross-examination of key prosecution witnesses. This claim is directed primarily at the circumstances involving the testimony of John Musgrave. Musgrave testified on cross-ex-

amination that about four months prior to the trial, he made a tape-recorded statement to the deputy county attorney, the late C. L. Bates, which was witnessed by undersheriff Rodabaugh. Defense counsel then made a request for production of the tape so that he could use it to cross-examine the witness.[18] The county attorney's reply was that the defense was welcome to the tape, but inasmuch as Mr. Bates was deceased, an inquiry had to be made as to its whereabouts. Defense counsel continued his interrogation of the witness which he again interrupted with another demand for production of the tape, coupled with a request to detain the witness until such time as the county attorney complied with the demand. The county attorney made assurances that he would produce the tape if it could be found, and that all efforts were being made to locate it. The trial court then granted defense counsel's request to detain the witness until the tape was produced.

A few days later, defense counsel agreed to excuse Musgrave since he had been advised by the county attorney that the tape was unavailable. The county attorney noted for the record that his office could not locate the tape from the effects of the late Mr. Bates. The trial court then excused Musgrave.[19]

The defendant claims that the taped statement was essential to test Musgrave's credibility since his testimony conflicted with that of Paula Cason in two respects.

---

**18.** While the briefs submitted to this court do not mention the rule's applicability, this is a case in which defense counsel made a request for production of evidence which conforms to the procedure provided for under Rule 18(c)(1), W.R.Cr.P.:

"After a witness called by the State has testified on direct examination, the court shall, on motion of the defendant, order the State to produce any statement (as hereinafter defined) of the witness in the possession of the State which relates to subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."

Rule 18(c), W.R.Cr.P., is derived from the so-called Jencks Act, Title 18, § 3500, U.S.C.A.; *DeLuna v. State*, Wyo.1972, 501 P.2d 1021. Accordingly, we will rely on federal cases in arriving at a proper solution to the issue raised in this case.

Rule 18(c)(4) limits access to the State's files to only those materials which fit in the definition of "statement" of a State's witness which includes, inter alia, a recording of an oral statement. It was the purpose of the Jencks Act to restrict the use of such statements to impeachment of witnesses called by the prosecution. *DeLuna v. State*, 501 P.2d at 1024, quoting from *Palermo v. United States*, 1959, 360 U.S. 343, 349, 79 S.Ct. 1217, 3 L.Ed.2d 1287, reh. den. 361 U.S. 855, 80 S.Ct. 41, 4 L.Ed.2d 94. A more complete statement is found in *Campbell v. United States*, 1961, 365 U.S. 85, 92, 81 S.Ct. 421, 425, 5 L.Ed.2d 428, on remand, 1 Cir., 296 F.2d 527, on remand, D.C., 199 F.Supp. 905, supplemented 1 Cir., 303 F.2d 747, affirmed 1 Cir., 303 F.2d 747, on remand, D.C., 206 F.Supp. 213:

"* * * [A]s the legislative history makes clear, the Jencks Act 'reaffirms' our holding in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, that the defendant on trial in a federal criminal prosecution is entitled, for impeachment purposes, to relevant and competent statements of a government witness in possession of the Government touching the events or activities as to which the witness has testified at the trial. S Rep No. 981, 85th Cong, 1st Sess, p. 3. And see H R Rep No. 700, 85th Cong, 1st Sess pp. 3–4. The command of the statute is thus designed to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian."

**19.** The colloquy with regard to the unavailability of the tape appears as follows:

"MR. WHITAKER: Your Honor, we had one more witness that Mr. Hall and I have talked about. Mr. Musgrave was excused, and we were going to try to use a tape that he had made, a taped statement for the purpose of cross-examination. Since that time we have been advised by Mr. Hall that the tape is unavailable.

"So, there is no point in keeping Mr. Musgrave around if the tape is gone.

"MR. HALL: Let the record show also, your Honor, that my office has made a very diligent effort to recover that tape among the effects of my late deputy, Mr. C. L. Bates, who died May 26. We just can't find them.

"COURT: All right. Do you want to excuse them both?

"MR. WHITAKER: Yes.

"COURT: All right. He may be excused, Mr. Musgrave."

No misconduct is evident.

First, contrary to Mrs. Cason's version, Musgrave said that he saw the defendant in the presence of Richmond and Cason about 10:00 in the morning on the day of the crime. Second, another conflict arises out of Musgrave's statement that he saw the defendant with the two codefendants on the outskirts of Sinclair between 2:00 and 3:00 that afternoon. The inference to be drawn from this testimony was that the three confederates were "casing" the service station. The defendant, however, fails to mention that Musgrave's testimony was corroborated by at least one witness in both instances.

Musgrave's taped statement falls squarely under the provisions of Rule 18(c), W.R.Cr.P., which require the State to produce any statement of witness who is called by the prosecution but only after the witness has testified on direct examination. The *Brady* rule does not automatically entitle the defense to disclosure of a Rule 18(c) statement prior to the direct testimony of the prosecution's witness. *United States v. Harris,* 5 Cir. 1972, 458 F.2d 670, 676, cert. den. *Scott v. United States,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145. Legislative history makes it clear that it was not intended to authorize broad disclosures of the state's investigative files. *Ogden v. United States,* 9 Cir. 1962, 303 F.2d 724, appeal after remand 9 Cir., 323 F.2d 818, cert. den. 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86, and the fundamental requirements of due process do not compel the premature disclosure prior to trial of statements ultimately subject to discovery under the rule. Cf. *United States v. Montos,* 5 Cir. 1970, 421 F.2d 215, 221, cert. den. 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532.

Rule 18(c)(1) limits statements discoverable thereunder "to subject matter as to which the witness has testified." It provides that the trial court shall order production of statements to which the defendant is entitled on motion of the latter. The trial court's function is limited to the question of whether the requested material is a "statement" under Rule 18(c)(4) and, if so, whether it relates to the subject matter of the witness' testimony. *Lewis v. United States,* 8 Cir. 1965, 340 F.2d 678, 682. Once it is established that the statement is discoverable, the defendant has an absolute right to its production, or in the alternative, could have the testimony of the witness stricken if the State refuses to comply with the order. Rule 18(c)(1) and (3), W.R.Cr.P. Failure of the trial court to order production of discoverable statements is reversible error. *Clancy v. United States,* 1961, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574.

The burden rests on the defendant to invoke Rule 18(c) at the proper time and in the proper manner so that it is possible for the trial court to make an appropriate inquiry into his request. *Ogden v. United States,* supra, 303 F.2d at 733; *Lewis v. United States,* supra; *United States v. Annunziato,* 2 Cir. 1961, 293 F.2d 373, cert. den. 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134. It is possible for the defendant to abandon his request for production under Rule 18(c) which forecloses his raising any issue with respect thereto on appeal. *Lewis v. United States,* supra, 340 F.2d at 682. In the case at bar, we can only conclude that when defense counsel agreed to excuse the witness Musgrave, he put the matter to rest. At this juncture, counsel could have moved to have Musgrave's testimony stricken from the record because of the State's failure to produce the taped statement which Musgrave purportedly made, or for an order under Rule 18(c)(2) that the county attorney deliver its file on Musgrave for an in camera inspection. He did neither. This case bears some similarity to *United States v. Paroutian,* 2 Cir. 1963, 319 F.2d 661, cert. den. 375 U.S. 981, 84 S.Ct. 494, 11 L.Ed.2d 426, wherein the court made this appropriate statement at 664:

" * * * Having led the district court to believe that he was abandoning the issue of the producibility of De Almeida's alleged statement under § 3500, appellant can hardly be heard to press the issue here. *United States v. Annunziato,* 293 F.2d 373, 382 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); *United States v. Klinghoffer*

*Bros. Realty Corp.*, 285 F.2d 487 (2 Cir. 1960); see *United States v. Watts*, 319 F.2d 659 (2 Cir. 1963)."

Our holding is bolstered by the defendant's failure to include the cassette tape in his post-trial motion for an evidentiary hearing to determine the alleged suppression of certain itemized evidence. We do not urge that Rule 18(c) be given an overly technical interpretation, but neither do we desire to permit its use as a device for creating inadvertent error. *Ogden v. United States*, supra.

■ The defendant also asserts that he was entitled to examine prior to trial notes made by the deputy county coroner as to the procedure followed on the day he picked up William Johnson's body. These notes were used by the witness while on the stand to refresh his memory relating to the subject matter of his testimony. While the witness was testifying on cross-examination, defense counsel requested to be allowed to inspect the notes. The request was granted by the trial court, and we can see no error in this procedure. The defendant received what he was entitled to. *Eckhardt v. People*, 1952, 126 Colo. 458, 250 P.2d 1009; *People v. Gezzo*, 1954, 307 N.Y. 385, 121 N.E.2d 380.

We find no merit in the defendant's claim that the prosecution engaged in massive suppression of evidence exculpatory to his defense.

### DENIAL OF NEW TRIAL

The defendant asserts in his third assignment of error that the trial court erroneously denied his motion for a new trial based upon newly discovered evidence. The motion was based on an affidavit signed by Richmond in which he purportedly admitted that he had killed William Johnson while the defendant, who supposedly refused to go through with the robbery attempt, remained outside of the building.

■ It is clearly within the sound discretion of the trial court to grant or deny a motion for a new trial based upon newly discovered evidence, and the action of the trial court shall not be the basis for the reversal of the conviction unless an abuse of discretion is affirmatively shown. *Daellenbach v. State*, Wyo.1977, 562 P.2d 679; *Ballinger v. State*, Wyo.1968, 437 P.2d 305, 307; *Opie v. State*, Wyo.1967, 422 P.2d 84, 85. In the appendix of the defendant's brief to this court appears a letter, dated September 22, 1975, wherein the trial court notified both State and defense counsel of its decision to deny the defendant's motion. The primary reason given by the court was its reliance "on the affidavit of a convicted felon which contains allegations at odds with his sworn testimony in his own trial." Richmond's statement, given to undersheriff Rodabaugh, is in the record as a part of the preliminary proceedings for issuance of a joint warrant. This statement directly places the responsibility on the defendant for the shooting of the victim.

■ Recanted testimony should be viewed with the utmost suspicion, *Sims v. State*, Wyo.1972, 495 P.2d 256, and when a motion for a new trial, based upon recantation, is denied by the trial court, this court will ordinarily be bound by that decision. *Espy v. State*, 1939, 54 Wyo. 291, 92 P.2d 549, 559. In *Flaim v. State*, Wyo.1971, 488 P.2d 153, this court quoted the following language which is most appropriate to this case: " 'There is no form of proof so unreliable as recanting testimony. * * * Those experienced in the administration of the criminal law know well its untrustworthy character.' " 488 P.2d at 155.

■ It is suggested that Richmond's affidavit is not recantation testimony because he did not testify at the defendant's trial. Richmond, however, was offered immunity to testify in the defendant's case. He still refused to testify even when faced with the threat of a contempt of court citation. Richmond was separately tried and convicted of a crime which involved the same series of events for which the defendant was placed on trial. Richmond's previous statements were calculated to have the defendant shoulder the responsibility for the murder and, thereby, exonerate himself. The fact that Richmond and the defendant

were tried separately for the same acts does not alter the recanting character of the former's affidavit. We find no abuse of discretion in the trial court's action.

The defendant received a fair trial and there is no error.

Affirmed.

GUTHRIE, C. J., and THOMAS and ROSE, JJ., concur.

McCLINTOCK, J., specially concurring with opinion.

McCLINTOCK, Justice, specially concurring.

I concur in the affirmance of the conviction and with most of what has been said in the opinion. However, reference therein to *Blakely v. State,* Wyo., 542 P.2d 857, 863 (1975) as to the "standard of review which this court must follow" leaves me with the same misgivings as I expressed in my dissent in that case. I think that the instruction given in this case, which I interpret to be in line with previous decisions of this court, perhaps overruled in *Blakely,* became the law of the case and we should analyze the evidence to determine whether the conviction was consistent with those rules. I find the evidence to comply with that requirement and therefore concur in the conviction.